STATE OF NORTH CAROLINA v. PHILIP MORRIS USA INC.; R.J. REYNOLDS TOBACCO COMPANY; BROWN & WILLIAMSON TOBACCO CORPORATION, INDIVIDUALLY AND AS SUCCESSOR BY MERGER TO THE AMERICAN TOBACCO COMPANY; AND LORILLARD TOBACCO COMPANY

No. 2A05-4

(Filed 6 November 2009)

**1. Contracts— tobacco settlement—offset provision—legislation ending price support system**

Defendant tobacco companies (the Settlors) may offset their financial obligations under the Fair and Equitable Tobacco Reform Act of 2004 (FETRA) against all payments due the National Tobacco Grower Settlement Trust even though growers in states that had not participated in the tobacco price support system (Maryland and Pennsylvania) would not benefit from the FETRA provisions that ended the price support system. The language of the Trust is clear. The parties intended that an offset provision apply to the Settlors' entire obligation under the Trust, not just to that portion designated for those receiving FETRA benefits.

**2. Contracts— conflicting court opinions—no ambiguity**

Conflicting opinions from the Business Court, the Court of Appeals majority, and the Court of Appeals dissent interpreting a provision of the Tobacco Grower Settlement Trust did not indicate an ambiguity. A contract is ambiguous only when, in the opinion of the court, the language is fairly and reasonably susceptible to either of the constructions contended by the parties. In this case, the language of the Trust is clear.

**3. Contracts— tobacco settlement—subsequent legislation— obligations offset—trust promise not illusory**

An offset provision in the Tobacco Grower Settlement Trust did not render the promise of the Trust illusory where the offset would allow obligations to the Trust to be reduced by amounts paid pursuant to legislation ending the tobacco price support system, even though not all of the states participating in the Trust participated in the price support system or received the benefit of payments made pursuant to its end. To render a promise illusory, the promisor must reserve an unlimited right to determine the nature or extent of performance. Here, no party has an unlimited

right to determine whether, or to what extent, to perform any obligation resulting in or arising from the Trust.

**4. Trusts— tobacco settlement—subsequent legislation ending price supports—offsets—no equitable modification**

States that did not participate in the tobacco price support system were not entitled to an equitable modification of the Tobacco Grower Settlement Trust because the Settlors (tobacco companies) were allowed to offset their obligations to the Trust by the amount paid as a part of ending the price support system. The statute ending the price support system, FETRA, was not an unanticipated circumstance.

Justice TIMMONS-GOODSON dissenting.

Justice HUDSON joins this dissenting opinion.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 194 N.C. App. ——, 669 S.E.2d 753 (2008), reversing an order and opinion entered on 17 August 2007 by Judge Ben F. Tennille in Superior Court, Wake County, and remanding for entry of summary judgment in defendants' favor. On 19 March 2009, the Supreme Court allowed a petition by plaintiffs State of Maryland and Commonwealth of Pennsylvania for discretionary review of additional issues. Heard in the Supreme Court on 10 September 2009.

*Douglas F. Gansler, Attorney General of Maryland, by Marlene Trestman, Special Assistant to the Attorney General, pro hac vice, for plaintiff-appellant State of Maryland Certification Entity; and Thomas W. Corbett, Jr., Attorney General of Pennsylvania, by Joel M. Ressler, Chief Deputy Attorney General, pro hac vice, for plaintiff-appellant Commonwealth of Pennsylvania Certification Entity.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Jim W. Phillips, Jr. and Charles F. Marshall III, for defendant-appellees Philip Morris USA Inc., R.J. Reynolds Tobacco Company, and Lorillard Tobacco Company; and Smith Moore Leatherwood LLP, by Gregory G. Holland, for defendant-appellee Philip Morris USA Inc.*

*K&L Gates LLP, by William G. Scoggin, for the North Carolina Chamber, amicus curiae.*

STATE v. PHILIP MORRIS USA, INC.

[363 N.C. 623 (2009)]

NEWBY, Justice.

This case requires us to once again review the National Tobacco Grower Settlement Trust. We undertake this review to determine whether defendant tobacco companies may, pursuant to the Tax Offset Adjustment provision of the Trust, offset their financial obligation under the Fair and Equitable Tobacco Reform Act of 2004 against all payments due the Trust. We hold that they may and affirm the Court of Appeals.

## I. BACKGROUND

Beginning in 1938 and continuing until the operation of the Fair and Equitable Tobacco Reform Act of 2004 (FETRA), Pub. L. No. 108-357, 118 Stat. 1521 (codified at 7 U.S.C. §§ 518 to 519a (2006)), the United States government largely regulated the production and supply of domestic tobacco through a system of price supports and quotas. This system utilized "price supports [to keep] tobacco prices elevated" and implemented quotas to curtail the amount of tobacco grown and "confine[] [its] cultivation . . . to specific tracts of land." *State v. Philip Morris USA Inc.* (*Philip Morris I*), 359 N.C. 763, 765, 618 S.E.2d 219, 220 (2005). The federal government annually adjusted those quota levels to remain responsive to tobacco companies' demand for domestic tobacco. *Id.* In its final years, the system began collapsing under its own weight. *Id.* The tobacco farmers toiling under this system experienced shrinking quotas due to a lessening demand for artificially high-priced domestic tobacco, a product of the federal price support system. *Id.* Growers in Maryland and Pennsylvania, however, did not fully experience the pressure of this collapse because they had chosen to not participate in the federal quota system, a choice that allowed them to grow unlimited quantities of tobacco, without the attendant federal price supports.

The tobacco processing industry also experienced difficulty during the final years of this system. Every state and several other American jurisdictions sued defendant tobacco companies ("Settlors") during the 1990s. 359 N.C. at 765, 618 S.E.2d at 221. These various lawsuits sought to "recover healthcare costs associated with smoking-related illnesses." *Id.* To dispose of these claims, Settlors entered into individual settlement agreements with four states, 359 N.C. at 765 n.2, 618 S.E.2d at 221 n.2, and into the Master Settlement Agreement ("MSA") with the remaining forty-six states and the six other complaining jurisdictions, *id.* at 765, 618 S.E.2d at 221. The

MSA was then entered as a consent decree and final judgment in each of the party jurisdictions. *Id.*

In addition to settling the pending lawsuits, the MSA imposed certain obligations on Settlors to reduce public demand for tobacco products. As the high cost of managing smoking-related health problems was the basis for the lawsuits settled by the MSA, Settlors were required to engage in various advertising efforts aimed at reducing the consumption of tobacco. 359 N.C. at 765 n.3, 618 S.E.2d at 221 n.3. All parties involved understood and indeed hoped that Settlors' efforts would lead to a·decreased demand for tobacco. *Id.* at 765, 618 S.E.2d at 221. However, the parties also comprehended that a decrease in the demand for tobacco would adversely affect the economies of tobacco producing states ("Grower States")[1] and the individual tobacco growers. *Id.* To remedy this situation, the MSA required Settlors to "meet with the political leadership of the [Grower States]" to create a method by which to mitigate these potentially harsh financial consequences. *Id.*

The method resulting from negotiations between Grower States and Settlors was the National Tobacco Grower Settlement Trust ("the Trust").[2] Under the Trust, Grower States released Settlors from any claims Grower States might "bring for economic damages suffered as a result of the MSA." *Id.* at 766, 618 S.E.2d at 221. In exchange, Settlors agreed "to spend approximately $5.15 billion on economic assistance." *Id.* at 765, 618 S.E.2d at 221. More specifically, Settlors agreed to make scheduled payments to the Trust each year, beginning in 1999 and ending in 2010. National Tobacco Grower Settlement Trust at A-1 to A-2 (July 19, 1999) [hereinafter Trust Agreement]. The amount of Settlors' scheduled base payments could be increased or decreased by certain adjustment provisions contained in the Trust. *Philip Morris I*, 359 N.C. at 767, 618 S.E.2d at 222 (citing Trust Agreement at A-1 to A-16). It is one of these adjustment provisions that is at issue in this appeal.

The source of the controversy is the Tax Offset Adjustment ("TOA") provision of the Trust. Trust Agreement at A-5 to A-11.

1. The Grower States are Alabama, Florida, Georgia, Indiana, Kentucky, Maryland, Missouri, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, and West Virginia.

2. The Trust was amended by order of the Business Court entered on 6 April 2004 approving an amendment agreed to by the parties following mediated settlement negotiations. That amendment does not affect our analysis in this case, and all references to the Trust are to the original 19 July 1999 document.

Because the parties "kn[ew] federal and state governments might take additional measures to aid tobacco farmers," *Philip Morris I*, 359 N.C. at 767, 618 S.E.2d at 222, the TOA provision was designed to prevent a situation in which Settlors were simultaneously providing aid to tobacco growers under both the Trust and a governmental obligation. The TOA provision of the Trust reads in pertinent part:

Tax Offset Adjustment. Except as expressly provided below, the amounts to be paid by the Settlors in each of the years 1999 through and including 2010 shall also be reduced upon the occurrence of any change in a law or regulation or other governmental provision that leads to a new, or an increase in an existing, federal or state excise tax on Cigarettes, or any other tax, fee, assessment, or financial obligation of any kind . . . imposed by any governmental authority ("Governmental Obligation") . . . on the Settlors, to the extent that all or any portion of such Governmental Obligation is used to provide:

(i) direct payments to Tobacco Growers or Tobacco Quota Owners;

(ii) direct or indirect payments, grants or loans under any program designed in whole or in part for the benefit of Tobacco Growers, Tobacco Quota Owners or organizations representing Tobacco Growers or Tobacco Quota Owners (including without limitation the stabilization cooperatives, the Farm Bureau or the Commodity Credit Corporation);

(iii) payments, grants or loans to Grower States to administer programs designed in whole or in part to benefit Tobacco Growers, Tobacco Quota Owners or organizations representing Tobacco Growers or Tobacco Quota Owners (including without limitation the stabilization cooperatives, the Farm[] Bureau or the Commodity Credit Corporation); or

(iv) payments, grants or loans to any individual, organization, or Grower State for use in activities which are designed in whole or in part to obtain commitments from, or provide compensation to, Tobacco Growers or Tobacco Quota Owners to eliminate tobacco production.

The amount of the Governmental Obligation used for any of the purposes set forth above shall be the "Grower Governmental Obligation."

In the event of such a Governmental Obligation, the amount otherwise required to be paid by each Settlor each year (after taking account of all adjustments or reductions hereunder) shall be reduced by an amount equal to the product of the amount of such Governmental Obligation paid in connection with Cigarettes manufactured by the Settlor (or tobacco or tobacco products used by the Settlor to manufacture Cigarettes) for the same year multiplied by the ratio of the Grower Governmental Obligation divided by the amount of the Governmental Obligation, which reduction amount may be carried forward to subsequent years as necessary to ensure full credit to the Settlor. If the Governmental Obligation results from a law or regulation or other governmental provision adopted by a Grower State, or by a political subdivision within such Grower State, the amount that a Settlor may reduce its payment to the Trust in any one year shall not exceed the product of the amount the Settlor otherwise would have paid to the Trust in that year in the absence of the Tax Offset Adjustment multiplied by the allocation percentage for the pertinent Grower State set forth in Section 1.03.

Trust Agreement at A-5 to A-7.

As the parties anticipated, Congress, by enacting FETRA, placed on Settlors a financial obligation that would allow reduction of their payments to the Trust under the TOA provision. FETRA ended the federal price support and quota system in the United States tobacco market. As we explained in *Philip Morris I*, FETRA "terminated the price control/quota system for U.S. tobacco beginning with the 2005 tobacco crop." 359 N.C. at 769, 618 S.E.2d at 223. To accomplish this, Congress instructed the "U.S. Secretary of Agriculture to offer tobacco farmers annual payments during each of fiscal years 2005 through 2014 in exchange for ending marketing quotas and related price supports." *Id.* at 770, 618 S.E.2d at 223 (citing FETRA §§ 622 to 623). The funding for these payments is provided by "[q]uarterly assessments against tobacco manufacturers and importers," a group that includes Settlors. *Id.* at 770, 618 S.E.2d at 223-24. Moreover, "FETRA payments to tobacco farmers between 2005 and 2014 will approach $9.6 billion." *Id.* at 769, 618 S.E.2d at 223 (citation omitted). As the Court of Appeals correctly noted, "It is undisputed that the amounts Settlors are required to pay to tobacco farmers under

FETRA exceeds" Settlors' remaining obligation to the Trust. *State v. Philip Morris USA Inc.,* —— N.C. App. ——, ——, 669 S.E.2d 753, 755 (2008).

In *Philip Morris I,* this Court examined the TOA provision of the Trust in light of Congress's enactment of FETRA in order to determine exactly when Settlors could offset their obligation under FETRA against amounts due the Trust. There, Settlors claimed that the enactment of FETRA imposed a financial obligation on them, requiring application of the TOA provision and relieving Settlors of their duty to the Trust immediately "upon the occurrence of [the] change in . . . law." Trust Agreement at A-5. The Trustee claimed, however, that Settlors were not entitled to cease payments to the Trust until Settlors actually started making payments under FETRA. The Trustee stated that the change in law was only the first step leading to the later application of the TOA provision. To support this contention, the Trustee pointed to the entire TOA provision, which states in pertinent part:

> In the event of such a Governmental Obligation, the amount otherwise required *to be paid* by each Settlor each year . . . shall be reduced by an amount equal to the product of the amount of such Governmental Obligation *paid* in connection with Cigarettes manufactured by the Settlor . . . for the same year multiplied by the ratio of the Grower Governmental Obligation divided by the amount of the Governmental Obligation, which reduction amount may be carried forward to subsequent years as necessary to ensure full credit to the Settlor.

*Id.* at A-7 (emphasis added). This language, the Trustee explained, requires, *inter alia,* the amount of the Governmental Obligation "paid" to be known before the amount by which Settlors may reduce their payments under the TOA provision can be determined.

This Court, after examining the language of the Trust and FETRA, decided that the Trustee's construction of the language of the TOA provision embodied the intent of the parties at the time the Trust was executed. Despite the tension created by the TOA provision's express timing statement that "the amounts to be paid by the Settlors . . . shall . . . be reduced *upon the occurrence* of any *change in a law,*" *id.* at A-5 (emphasis added), we concluded that reading these words alone to determine the timing of the offset failed to give other words in the TOA provision their ordinary meaning. 359 N.C. at 775, 618 S.E.2d at 227. The TOA provision clearly explained that

Settlors must know the amount they had paid pursuant to a Governmental Obligation before they can determine the amount by which to reduce their payments to the Trust. *Id.* at 775-76, 618 S.E.2d at 227. Finally, using the Trust's purpose to buttress our construction of the conflicting language found in the TOA provision, we said that applying the TOA provision before Settlors began making payments under FETRA could result in a scenario in which all Settlors made no payments, either under FETRA or the Trust, and all Tobacco Growers and Tobacco Quota Owners received no benefits, either from FETRA or the Trustee. *Id.* at 779-80, 618 S.E.2d at 229. Thus, we concluded that the TOA provision was not intended to create a gap in payments and could be applied not when FETRA was signed into law, but when Settlors have "actually assume[d] the burden of FETRA." *Id.* at 781, 618 S.E.2d at 230. Following our decision, Settlors continued funding the Trust until they began making required payments under FETRA. At the time Settlors ceased funding the Trust and began paying FETRA assessments, Settlors had paid nearly $2.7 billion to the Trust, with nearly $25 million of that sum being paid to Maryland and Pennsylvania.

The Maryland Certification Entity and the Pennsylvania Certification Entity ("the States") recognized that FETRA was unlikely to provide benefits to their tobacco growers who were covered by the Trust because those growers had not participated in the federal quota and price support system. The measure originally introduced in the House of Representatives provided no benefits to the States' growers. As the legislation creating FETRA moved through the political process, the bill underwent several revisions. The Senate amended the bill on 15 July 2004 to allow "Tobacco Community Economic Development Grants" of $20 million to Maryland and $14 million to Pennsylvania. Tobacco Market Transition Act of 2004, S. Amend. 3563, amending S. Amend. 3562 to H.R. 4520, 108th Cong. § 380O(c)(1), (2) (2004). The bill signed into law by the President on 22 October 2004, however, did not include those Grants. As a result, on 17 December 2004, the States moved to clarify or modify the Trust so they would continue receiving payments from the Trust for the benefit of their growers. The States supplemented their motion with a Statement of Claim For Continued Payments on 24 June 2005.

The States made two arguments in the Business Court. First, the States claimed that they were entitled to continued benefits from the Trust because none of Settlors' financial obligation under FETRA was being used to benefit their growers. Second, the States claimed that

if the Trust allowed Settlors to discontinue payments to the Trust, then the Trust should be modified to require continued payments for the benefit of growers in the States. In support of their modification argument, the States claimed that the parties did not anticipate a situation in which Congress benefitted some tobacco growers and not others. Settlors responded that their payment obligations under FETRA extinguished their obligation to fund the Trust. In granting summary judgment, the Business Court agreed with the States that the Trust, in light of its stated purpose to benefit tobacco farmers, requires Settlors to continue making payments to the Trust for the benefit of the States.

The Court of Appeals disagreed with the Business Court's reading of the Trust. Basing its opinion on this Court's decision in *Philip Morris I* and on the plain language of the Trust, the Court of Appeals held that the TOA provision allows Settlors to offset the payments made under FETRA against Settlors' obligation to the Trust. *State v. Philip Morris USA Inc.*, —— N.C. App. at ——, 669 S.E.2d at 757. Relying on a dissenting opinion filed at the Court of Appeals, the States appealed as of right to this Court on the issue of whether Settlors are required to continue making payments to the Trust for the benefit of the States. This Court allowed discretionary review on the issue of equitable modification of the Trust and the derivative issue of what evidence could be considered in determining the propriety of any equitable modification.

## II. ANALYSIS

[1] As in *Philip Morris I*, this is a case of contract interpretation, and our review is de novo. *Philip Morris I*, 359 N.C. at 773, 618 S.E.2d at 225 (citation omitted).

Further, in our first opinion in this case, we set out the principles of contract interpretation applicable to the Trust:

Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution. *Lane v. Scarborough*, 284 N.C. 407, 409-10, 200 S.E.2d 622, 624 (1973). "If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." *Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("A consent judgment is a court-approved contract subject to the rules of contract interpretation."). Intent is derived not from a particular contractual term

but from the contract as a whole. *Jones v. Casstevens*, 222 N.C. 411, 413-14, 23 S.E.2d 303, 305 (1942) (" 'Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole.' ") (citation omitted).

*Id.* (footnote omitted). However, we are also mindful that in reviewing the entire agreement, our task is not "to find discord in differing clauses, but to harmonize all clauses if possible." *Peirson v. Am. Hdwe. Mut. Ins. Co.*, 249 N.C. 580, 583, 107 S.E.2d 137, 139 (1959) (citations omitted). Furthermore, when the terms of a contract "are plain and unambiguous, there is no room for construction. The contract is to be interpreted as written," *Jones*, 222 N.C. at 413, 23 S.E.2d at 305 (citations omitted), and "enforce[d] . . . as the parties have made it," *Wachovia Bank & Tr. Co. v. Westchester Fire Ins. Co.*, 276 N.C. 348, 354, 172 S.E.2d 518, 522 (1970) (citations omitted).

Here, the disagreement among the parties lies in the portion of the TOA provision determining the amount by which Settlors may reduce their obligation to the Trust: specifically, whether Settlors may offset their FETRA obligation against the amount due the Trust for all Grower States, or whether Settlors are entitled to offset their FETRA obligation against only the amount designated for those Grower States actually receiving FETRA benefits. To resolve this dispute, we first examine the language of the Trust.

The TOA provision contains the formula used in determining the amount by which Settlors may reduce their payments to the Trust following the creation of a Governmental Obligation. That formula provides that the amount of the payments otherwise required of Settlors "shall be reduced by an amount equal to the product of the amount of such Governmental Obligation paid . . . multiplied by the ratio of the Grower Governmental Obligation divided by the amount of the Governmental Obligation." Trust Agreement at A-7.

Before we interpret this formula, we are constrained to mention several other principles of contract interpretation applicable to the provision at issue. If the parties agreed to define a term, and the Trust "contains a definition of a term used in it, this is the meaning which must be given to that term wherever it appears in the [Trust], unless the context clearly requires otherwise." *Wachovia Bank & Tr.*, 276 N.C. at 354, 172 S.E.2d at 522 (citation omitted). Furthermore, any undefined, nontechnical word is "given a meaning consistent with the

sense in which [it is] used in ordinary speech, unless the context clearly requires otherwise." *Id.* (citing *Peirson*, 249 N.C. at 583, 107 S.E.2d at 139). "Where the immediate context in which words are used is not clearly indicative of the meaning intended, resort may be had to other portions of the [Trust] and all clauses of it are to be construed, if possible, so as to bring them into harmony." *Wachovia Bank & Tr.*, 276 N.C. at 355, 172 S.E.2d at 522 (citing *Peirson*, 249 N.C. at 583, 107 S.E.2d at 139).

The TOA provision defines "Governmental Obligation" and "Grower Governmental Obligation." *Id.* at A-6. Accordingly, we must ascribe to these terms the meanings the parties intended. *See, e.g., Wachovia Bank & Tr.*, 276 N.C. at 354, 172 S.E.2d at 522. The parties defined the term "Governmental Obligation" as, *inter alia*, a "change in a law . . . that leads to a new . . . financial obligation of any kind . . . imposed by any governmental authority . . . on the Settlors." Trust Agreement at A-5 to A-6. The parties described a "Grower Governmental Obligation" as a Governmental Obligation that is used for "any" number of specified purposes, including "direct payments to Tobacco Growers *or* Tobacco Quota Owners." *Id.* at A-6 (emphasis added). Further, the parties agreed that the words " 'any' " and " 'or' " would be read as having the same meaning, and that meaning is " 'any one or more or all of.' " *Id.* para. 4.09 (stating further that words "in the text of this Agreement shall be read as the singular or plural and as the masculine, feminine or neuter as may be applicable or permissible in the particular context"). Thus, so long as the Governmental Obligation is being used to make payments to Tobacco Growers, Tobacco Quota Owners, both Tobacco Growers and Tobacco Quota Owners, or any subset of Tobacco Growers or Tobacco Quota Owners, the TOA provision allows Settlors to offset the total amount of the Governmental Obligation.[3]

The parties also defined the terms "Tobacco Grower" and "Tobacco Quota Owner." *Id.* para. 4.01. The Trust provides:

"Tobacco Grower" shall mean an individual or entity who, during a base period established by the Certification Entity for the pertinent Grower State, was *one or more* of the following:

---

3. Any number divided by itself is 1. Further, any number multiplied by 1 remains the same. Thus, if the Grower Governmental Obligation equals the Governmental Obligation, *i.e.*, Settlors' payments are entirely used for a purpose stated in the TOA provision, then the formula ratio is 1, and Settlors can reduce their payments to the Trust by the amount they pay under FETRA.

(i) the principal producer of tobacco for use in Cigarettes on a farm where tobacco was produced pursuant to a tobacco farm marketing quota or farm acreage allotment established under the Agricultural Adjustment Act of 1938 . . . ;

(ii) a producer who owned a farm that produced tobacco for use in Cigarettes pursuant to a lease and transfer to that farm of all or a part of a tobacco farm marketing quota or farm acreage allotment established under the Agricultural Adjustment Act of 1938;

(iii) a producer who rented farm land to produce tobacco for use in Cigarettes under a tobacco farm marketing quota or farm acreage allotment established under the Agricultural Adjustment Act of 1938;

(iv) an individual or entity in Maryland or Pennsylvania who in connection with the production of Maryland Type 32 tobacco for use in Cigarettes was one of the following:

    (a) the principal producer of such tobacco (which may include an operator, tenant, or sharecropper who shared in the risk of producing a crop and who was entitled to share in the revenues derived from marketing the Cigarette tobacco crop from the farm); or

    (b) a producer who owned or rented a farm that produced Maryland Type 32 tobacco for use in Cigarettes.

*Id.* para. 4.01(a) (emphasis added) (internal citations omitted). The Trust further provides: " 'Tobacco Quota Owner' shall mean the owner of record of a tobacco farm marketing quota or farm acreage allotment established under the Agricultural Adjustment Act of 1938 during a base period established by the Certification Entity for the Grower State in which the farm is located." *Id.* para. 4.01(b) (internal citation omitted).

Upon applying these definitions contained in the Trust and the ordinary meaning of nontechnical words, the language of the TOA provision is clear. The TOA provision may be implemented when, for example, a financial obligation on Settlors is used to make payments to "principal producer[s] of tobacco . . . produced pursuant to a tobacco farm marketing quota or farm acreage allotment established under the Agricultural Adjustment Act of 1938." *Id.* para. 4.01(a)(i). The offset is then allowed because the financial obliga-

tion on Settlors is used to make "direct payments to Tobacco Growers." *Id.* at A-6. Similarly, the TOA provision may be applied when Settlors' assessments paid pursuant to a Governmental Obligation are used to pay the "owner[s] of record of . . . tobacco farm marketing quota[s] or farm acreage allotment[s] established under the Agricultural Adjustment Act of 1938," *id.* para. 4.01(b), because the assessments are being used to make "payments to . . . Tobacco Quota Owners," *id.* at A-6. Therefore, and controlling in the case *sub judice*, all financial obligations imposed on and paid by Settlors pursuant to FETRA used to make payments to an individual or entity described in *any* of the four, alternative categories of Tobacco Grower, *or* used to make payments to an individual or entity described in the Trust's definition of Tobacco Quota Owner, can be offset against Settlors' obligation to the Trust. An examination of the Trust as a whole has revealed no text that contradicts the meaning of the plain language of the TOA provision.

Since the language of the Trust is clear, we must infer the intent of the parties "from the words of the contract." *Walton*, 342 N.C. at 881, 467 S.E.2d at 411 (citing *Lane*, 284 N.C. at 410, 200 S.E.2d at 624-25). The TOA provision is firm in its command that Settlors' obligation to the Trust "*shall . . . be reduced*" by the total amount of any financial obligation used to benefit *any one* of the numerous individuals or entities listed in any of the four disjunctive categories by *any method* described in the category in which the benefitted individuals or entities are found, even if it be only one type of individual by only one method. Trust Agreement at A-5 to A-6 (emphasis added). The TOA provision's definition of Grower Governmental Obligation reinforces that *any* benefit flowing from Settlors to *any* of the individuals or entities listed, without regard to geographic location, in *any* of the four disjunctive categories, "*shall be* the 'Grower Governmental Obligation.'" *Id.* (emphasis added). The parties agreed that the words "'any'" and "'or'" would each mean "'any one or more or all of,'" and the language used by the parties indicates that the word "or" as used twice in the definition was given its common, ordinary meaning by the parties. "Given the degree of lawyerly scrutiny each word of the Trust Agreement doubtless underwent, we are not inclined to interpret the terms of Schedule A in a fashion that deviates from the meaning commonly ascribed to them." *Philip Morris I*, 359 N.C. at 775, 618 S.E.2d at 227. Using the appropriate meanings of these words, the amount of the Governmental Obligation on Settlors under FETRA being used to make payments to *any* of the four disjunctive categories of Tobacco Growers, *or* to To-

bacco Quota Owners, constitutes the Grower Governmental Obligation. Consequently, we conclude that the parties intended the TOA provision to offset Settlors' entire obligation to the Trust, not only that portion designated for those now receiving FETRA benefits.

Since the plain language of the TOA provision, after examining the Trust as a whole, is clear and unambiguous, it does not permit construction and our inquiry ends here. *See Wachovia Bank & Tr.*, 276 N.C. at 354, 172 S.E.2d at 522 (explaining that if there is no ambiguity the court does not apply rules of construction); *Jones*, 222 N.C. at 413, 23 S.E.2d at 305 (stating that when contract terms "are plain and unambiguous, there is no room for construction"); *Wallace v. Bellamy*, 199 N.C. 759, 763, 155 S.E. 856, 859 (1930) ("In the interpretation of contracts the general rule is that a court will not resort to construction where the intent of the parties is expressed in clear and unambiguous language . . . ."); *McCain v. Hartford Live Stock Ins. Co.*, 190 N.C. 549, 551, 130 S.E. 186, 187 (1925) ("Rules of construction are only aids in interpreting contracts that are either ambiguous or not clearly plain in meaning, either from the terms of the contract itself, or from the facts to which it is to be applied."). An examination reaching beyond the face of the whole contract to ascertain the parties' intent is necessary only when construing an ambiguous contract term. *Jones*, 222 N.C. at 413-14, 23 S.E.2d at 305; *Simmons v. Groom*, 167 N.C. 271, 275, 83 S.E. 471, 473 (1914) ("It is well recognized that the object of all rules of interpretation is to arrive at the intention of the parties as expressed in the contract . . . ." (citation and internal quotation marks omitted)).

Assuming *arguendo*, however, that the TOA provision is ambiguous, the parties' intent, illustrated by inferences to be made from the Trust as a whole and the Trust's purpose, accords with the express language of the TOA provision. The plain language of the TOA formula is consistent with other portions of the TOA provision. Realizing that the formula created in the TOA provision broadly defined "Governmental Obligation" to include virtually any obligation imposed by any governmental body, the parties included in the TOA provision a method by which to prevent one Grower State from imposing an obligation on Settlors that would result in decreased payments to other Grower States. *See* Trust Agreement at A-7. This portion of the TOA provision allows Settlors to offset amounts paid under any obligation imposed by "a Grower State, or by a political subdivision within such Grower State," only by the amount that Grower State would have otherwise received according to the "allo-

## STATE v. PHILIP MORRIS USA, INC.

[363 N.C. 623 (2009)]

cation percentage for the pertinent Grower State set forth in Section 1.03" of the Trust. *Id.* As the plain language indicates, this portion only applies to obligations imposed at the state or local level. There is no comparable portion of the TOA provision that reduces Settlor payments following a federal Governmental Obligation based on which state is receiving benefits from that Governmental Obligation. As such, like the Court of Appeals, we conclude that the sophisticated parties to the Trust intended to apply the TOA provision to reduce those amounts due the state or states receiving benefits from a Governmental Obligation only when dealing with an obligation created by a state or local government. *State v. Philip Morris USA Inc.*, —— N.C. App. at ——, 669 S.E.2d at 757 (citing *Hartford Accident & Indem. Co. v. Hood*, 226 N.C. 706, 710, 40 S.E.2d 198, 201 (1946) ("It must be presumed the parties intended what the language used clearly expresses and the contract must be construed to mean what on its face it purports to mean." (citations omitted))).

Moreover, the parties understood how to express their intention to have Settlors reduce their payments to the Trust based on which states were receiving benefits from a Governmental Obligation and apparently chose not to do so with respect to an obligation imposed by the federal government. However, the States contend that, for our reading of the TOA provision to be correct, there would need to be additional language in the provision stating that the funds paid by Settlors pursuant to a Governmental Obligation used to benefit individuals or entities "IN ANY ONE OR MORE GROWER STATES" would constitute the Grower Governmental Obligation. In the absence of this additional language allowing Settlors to reduce their payments without reference to which states are receiving governmental benefits, the States contend, Settlors are prohibited from reducing their payments in any manner other than by the percentage of those payments to the Trust originally designated for those states now receiving benefits under a Governmental Obligation.

Section 1.03 of the Trust, however, designates the percentage of Settlors' payments each Grower State is to receive. Trust Agreement para. 1.03. The parties explicitly instructed Settlors to consult Section 1.03 when determining the amount by which to reduce their payments to the Trust in several portions of the TOA provision by including express references to Section 1.03. Significantly, however, the parties instructed Settlors to consult Section 1.03 in the TOA provision only when discussing reductions in Settlor payments following an obligation imposed by a state or local government. *Id.* at A-7 to

A-8. That the TOA provision instructs Settlors to consult Section 1.03 only when referring to a financial obligation imposed by a government other than the federal government is consistent with the plain language of the TOA provision that Settlors may offset payments made pursuant to FETRA against their obligation to the Trust without any reference to which states are receiving FETRA benefits. To read the TOA provision otherwise would impermissibly add an additional requirement to consult Section 1.03 that the parties did not choose to include. *Hartford Accident & Indem.*, 226 N.C. at 710, 40 S.E.2d at 201-02 ("The Court, under the guise of construction, cannot reject what the parties inserted or insert what the parties elected to omit." (citations omitted)).

Furthermore, the organization of the Trust document is consistent with an intention for Settlors to not consult Section 1.03 without an explicit instruction to do so. Schedule A of the Trust contains the Trust's "PAYMENT SCHEDULE." Trust Agreement at A-1. This part of the Trust establishes the amounts *Settlors* must pay to the Trust and the dates by which *Settlors* must make those payments. *Id.* at A-1 to A-18. Generally, Schedule A sets forth Settlors' total base payment figures for each of the years 1999 through 2010. *Id.* at A-2. Schedule A then details various adjustments, including the TOA provision, that must be made to the total base payment figure to determine the actual amount Settlors must pay. *Id.* at A-4 to A-16. Schedule A also provides the method for determining what percentage of the adjusted total amount must be paid by each Settlor. *Id.* at A-2 to A-4. Conversely, Section 1.03 of the Trust commands the *Trustee* to allocate a certain percentage of the Trust funds to each Grower State. *Id.* para. 1.03. Moreover, this command to the Trustee regarding allocation of disbursements from the Trust is contained in a separate part of the Trust. There is neither an instruction to Settlors to look to Section 1.03 nor a reference to Section 1.03 regarding offsetting payments made pursuant to an obligation imposed by the federal government. Thus, the organization of the Trust document is consistent with the plain language of the TOA provision.

The manner in which the Trust operates also precludes the inference that Settlors may offset their FETRA obligation against only those amounts that would have been disbursed from the Trust to those Grower States now receiving FETRA benefits. Once the Trust was executed and began operation, Settlors no longer engaged the other parties to the Trust on a state-specific basis. Settlors made annual payments to the Trust in an amount representing the benefit

STATE v. PHILIP MORRIS USA, INC.

[363 N.C. 623 (2009)]

all Grower States would receive.[4] *Id.* at A-1 to A-2. After Settlors made payments to the Trust, the Trustee could then set aside expenses incurred or to be incurred in administering the Trust. *Id.* para. 1.03. After the Trustee set aside funds for administrative expenses, the Trustee would then allocate the remaining funds among the accounts of the several Grower States. *Id.* The Trust operated in this manner, with Settlors paying a total sum unaffected by the percentage that any Grower State was to receive, unless the parties provided Settlors a specific contrary instruction. On several occasions, the parties did provide Settlors with a contrary instruction, and Settlors were thus able to reduce the amount of their payment to the Trust by an amount related to a specific Grower State. *E.g.*, Trust Agreement at A-7 (Tax Offset Adjustment) (instructing Settlors to consult Trustee's allocation percentage table following a Grower State-imposed Governmental Obligation); *id.* at A-8 (Tax Offset Adjustment) (allowing Settlors to consult Trustee's allocation percentage table following a Grower State's imposition of an obligation on Settlors to "purchase or use . . . a minimum quantity or percentage of domestically grown tobacco for Cigarettes"); *id.* at A-11 (MSA Finality Adjustment) (enabling Settlors to consult the Trustee's allocation percentage table and to reduce their payments to the Trust by the amount a Grower State would have been allocated by the Trustee if that Grower State had achieved State-Specific Finality under the MSA). The parties did not instruct Settlors to consult the Trustee's allocation percentage table in determining the amount by which to reduce their payments to the Trust following the imposition of a financial obligation by the federal government. Because the Trust operates in such a manner that Settlors would reduce their total payments to the Trust by the total amount of any Governmental

---

4. Settlors' total base payment amounts are listed as:

| | |
|---|---|
| 1999 | $380,000,000 |
| 2000 | $280,000,000 |
| 2001 | $400,000,000 |
| 2002 | $500,000,000 |
| 2003 | $500,000,000 |
| 2004 | $500,000,000 |
| 2005 | $500,000,000 |
| 2006 | $500,000,000 |
| 2007 | $500,000,000 |
| 2008 | $500,000,000 |
| 2009 | $295,000,000 |
| 2010 | $295,000,000 |

Trust Agreement at A-2.

Obligation, unless Settlors were specifically instructed to reduce their payments on a state-specific basis, Settlors can offset their FETRA obligation against the total amount due the Trust. The parties agreed to apply the offset provisions, including the TOA provision, in this manner, and the manner in which the Trust operates only confirms this agreement between the parties and precludes the States' proposed reading of the TOA provision.

Finally, the TOA provision is consistent with the express purpose of the Trust. In *Philip Morris I*, we noted that "[t]he preamble announces the purpose of the Trust: '[T]o provide aid to Tobacco Growers and Tobacco Quota Owners and thereby to ameliorate potential adverse economic consequences to the Grower States.'" 359 N.C. at 766, 618 S.E.2d at 221 (second alteration in original). The parties, in expressing their purpose, used terms that they defined in the Trust. Trust Agreement para. 4.01. As explained earlier, an "individual or entity" is a Tobacco Grower under the Trust if he, she, or it "was [listed in] *one or more*" of four categories. *Id.* (emphasis added). Three of those four categories appear to fall within the definition of "producer of quota tobacco" under FETRA. *See* 7 U.S.C. § 518(6) (2006). Further, except for a possible difference in the time at which one must own the quota, the Trust's definition of Tobacco Quota Owner accords with the definition of "tobacco quota holder" under FETRA. *See id.* § 518(9) (2006). As such, the TOA provision is consistent with the Trust's express purpose because Tobacco Growers and Tobacco Quota Owners are receiving benefits under FETRA, thus relieving Settlors of their burden under the Trust.

Notably, the parties did not say their purpose was to ensure *all* Tobacco Growers and Tobacco Quota Owners received aid. In fact, the parties went to great lengths to ensure that the Trust was not read in such a manner. *See* Trust Agreement paras. 4.01, 4.09; *id.* at A-6. As long as Tobacco Growers and Tobacco Quota Owners are receiving benefits under FETRA, the purpose of the Trust is satisfied. In *Philip Morris I*, we explained, in rejecting Settlors' proposed reading of the TOA provision, that the purpose of the Trust was for Settlors to provide benefits to Tobacco Growers and Tobacco Quota Owners. 359 N.C. at 777, 779, 618 S.E.2d at 228-29. We emphasized the Trust's purpose because Settlors' reading would have allowed Settlors to pay nothing while no Tobacco Grower and no Tobacco Quota Owner received any benefit. Here, the circumstances are such that Settlors are making payments under FETRA, and Tobacco Growers and Tobacco Quota Owners are receiving benefits under FETRA—cir-

cumstances resulting in the fulfillment of the very purpose we examined and protected in *Philip Morris I*.

As the language of the TOA provision is clear and unambiguous, we hold that under the TOA provision, Settlors may offset all of their payments made under FETRA for the benefit of Tobacco Growers or Tobacco Quota Owners without any reference to which states are receiving benefits under FETRA. So long as Settlors' obligation under FETRA exceeds their obligation to the Trust, Settlors owe nothing to the Trust.

[2] The States alternatively contend that the TOA provision is ambiguous and should be construed in their favor. In support of their argument, the States explain that the Business Court and the dissenting opinion at the Court of Appeals interpreted the TOA provision in their favor, while the majority at the Court of Appeals interpreted the provision in Settlors' favor. These facts, however, are not what makes a contract term ambiguous. A contract term is ambiguous only when, "in the opinion of the court, the language of the [contract] is fairly and reasonably susceptible to either of the constructions for which the parties contend." *Wachovia Bank & Tr.*, 276 N.C. at 354, 172 S.E.2d at 522 (citation omitted); *see also Walton*, 342 N.C. at 881-82, 467 S.E.2d at 412 ("Parties can differ as to the interpretation of language without its being ambiguous . . . ."). As we have explained, the language of the TOA provision of the Trust is clear, and a federal government obligation does not result in application of the TOA provision to offset only those amounts to be remitted to those states that receive benefits under that federal obligation. Since the language of the TOA provision is clear, we are unable to, "under the guise of interpreting an ambiguous provision, remake the contract and impose liability upon [Settlors] which [they] did not assume and for which the [States] did not pay." *Wachovia Bank & Tr.*, 276 N.C. at 354, 172 S.E.2d at 522 (citations omitted).

[3] Furthermore, the TOA provision does not render illusory any promise in the Trust or in any release signed in exchange for the execution of the Trust. The States contend that a reading of the TOA provision other than theirs would allow "Settlors to avoid *any* obligation to address the economic concerns of Maryland and Pennsylvania growers if FETRA had gone into effect before the first Trust payment became due." This possibility, however, does not render illusory any promise or release from liability. To render a promise illusory, the promisor must reserve "an unlimited right to determine

the nature or extent of his performance." *Wellington-Sears & Co. v. Dize Awning & Tent Co.*, 196 N.C. 748, 752, 147 S.E. 13, 15 (1929). Here, Settlors agreed to make base payments, subject to certain adjustments contained in the Trust. Trust Agreement at A-1. The TOA provision, which is one of the adjustments contained in the Trust, allows Settlors to offset payments made under FETRA against payments due the Trust. The parties agreed to include the TOA provision in the Trust, and the States executed releases in exchange for Settlors' promise to pay the amount derived after applying all adjustments to the base payment.

To the extent that the States contend they would not have released potentially valuable claims against Settlors for economic damage resulting from the MSA if Settlors' obligation to the Trust could be eliminated without the States receiving commensurate benefits from the Governmental Obligation, the language of the TOA provision is contrary to their contention. The TOA provision allows Settlors to offset all benefits flowing from them to Tobacco Quota Owners via a Governmental Obligation. Maryland and Pennsylvania growers did not participate in the federal tobacco quota and price support system. Thus, any Governmental Obligation providing benefits only to Tobacco Quota Owners would have necessarily excluded those growers in Maryland and Pennsylvania because those growers did not participate in the federal quota system. The States agreed to the inclusion of the provision that allows Settlors' obligation to the Trust to terminate upon the satisfaction of a Governmental Obligation that provides "direct payments to . . . Tobacco Quota Owners." Trust Agreement at A-6. This provision, by the parties' choice, allows the States' benefits from the Trust to end even though the States would not then be receiving any governmental benefits if Congress had chosen to focus its support on only Tobacco Quota Owners.

Moreover, any Governmental Obligation imposed on Settlors is necessarily a result of the political process, which involves representatives of Maryland and Pennsylvania citizens, including growers, at the federal level, and at the state and local levels. While the parties to the Trust may have input in the political process that determines whether a Governmental Obligation is imposed, no party has an unlimited right to determine whether, or to what extent, to perform any obligation resulting in or arising from the Trust. Thus, the TOA provision does not render illusory any promise or release made or executed by the parties.

**STATE v. PHILIP MORRIS USA, INC.**

[363 N.C. 623 (2009)]

**[4]** Finally, the States contend that they are entitled to equitable modification of the Trust to require Settlors to continue making payments for their benefit. The Business Court and the Court of Appeals addressed the States' argument on this point. Though neither cited the section of our General Statutes under which the States make their claim, the Business Court declined to make its decision on equitable grounds, *State v. Philip Morris USA, Inc.*, No. 98 CVS 14377, 2007 WL 2570239, at *6-7 (Wake County Super. Ct. Aug. 17, 2007), and the Court of Appeals rejected the substance of the States' argument on this point, *State v. Philip Morris USA Inc.*, —— N.C. App. at ——, 669 S.E.2d at 756-57.

The States claim they are entitled to modification of the Trust under N.C.G.S. § 36C-4-412(a). This statute provides that "[t]he court may modify the administrative or dispositive terms of a trust . . . if, because of circumstances not anticipated by the settlor, modification . . . will further the purposes of the trust." N.C.G.S. § 36C-4-412(a) (2007). To obtain relief under this statute, the States must show, *inter alia*, an unanticipated circumstance. FETRA, however, is not such a circumstance. As we said in *Philip Morris I*, "[p]roblems with the tobacco industry prompted members of Congress to introduce more than twenty tobacco buyout bills from 1997 through 2004." 359 N.C. at 769, 618 S.E.2d at 223. Furthermore, the States knew that their tobacco growers did not participate in the federal quota and price support system and thus, may not be included in a federal buyout. Indeed, the portion of the Trust's definition of Tobacco Grower that specifically covers growers in Maryland and Pennsylvania is the only provision that does not include a reference to the Agricultural Adjustment Act of 1938. Trust Agreement para. 4.01(a)(iv). These events indicate that the States knew they were treated differently as a result of their choice to not participate in the federal price control and quota system and knew that they may not be covered by any federal buyout legislation targeting that system. Unfortunately, during the political process resulting in FETRA, the benefits that would have been provided to the States under the Senate amendment to the buyout bill were not included in the final version signed into law. The inclusion of the TOA provision indicates that a federal buyout like FETRA was an anticipated circumstance for which the parties created a plan. Accordingly, the States are not entitled to modification under N.C.G.S. § 36C-4-412(a). Because we hold that the States are not entitled to modification of the Trust, we necessarily do not reach the issue of what evidence may be used in undertaking such a modification.

## III. DISPOSITION

The Court of Appeals correctly held that Settlors may, pursuant to the TOA provision, offset all payments made under FETRA against all payments due the Trust, without regard to which states are receiving benefits under FETRA. That decision is therefore affirmed.

AFFIRMED.

Justice TIMMONS-GOODSON dissenting.

After citing rules of contract interpretation that require examining all component parts of a contract to determine the parties' intent, the majority devotes substantially all of its analysis to the "plain language" of the TOA, neglecting other provisions of the Trust Agreement that should inform its reading of the TOA. The majority concludes that, at the time of execution, the parties intended that a federal governmental obligation aiding some Grower States' tobacco farmers would completely discharge Settlors' obligation to fund the Trust to support tobacco farmers receiving no benefit from the federal governmental obligation. By so concluding, the majority does a literal about-face from its analysis in *Philip Morris I* of the very same Trust Agreement and TOA provision. Because I believe the majority disregards other language in the Trust Agreement that necessarily informs the correct interpretation of the TOA, and in doing so departs from its previous interpretation of the same provision, I must respectfully dissent.

"Interpreting a contract requires the court to examine the language of the contract itself for indications of the parties' intent at the moment of execution. . . . Intent is derived not from a particular contractual term but from the contract as a whole." *State v. Philip Morris USA Inc.*, 359 N.C. 763, 773, 618 S.E.2d 219, 225 (2005) (*Philip Morris I*) (citing, *inter alia, Jones v. Casstevens*, 222 N.C. 411, 413-14, 23 S.E.2d 303, 305 (1942) ("Since the object of construction is to ascertain the intent of the parties, the contract must be considered as an entirety. The problem is not what the separate parts mean, but what the contract means when considered as a whole." (citation and internal quotation marks omitted))). Therefore, a true assessment of the parties' intent at the moment they executed an agreement requires a searching evaluation of the entire agreement and not merely the component part that lies at the heart of the dispute. Thus, this Court's duty is to diligently examine all relevant language in the Trust Agreement, including the Master Settlement Agree-

ment (MSA) and individual releases referenced in the Trust Agreement, to arrive at the interpretation that best reflects the parties' intent when they executed the TOA. *See Robbins v. C.W. Myers Trading Post, Inc.*, 253 N.C. 474, 477, 117 S.E.2d 438, 440-41 (1960) ("Individual clauses in an agreement and particular words must be considered in connection with the rest of the agreement, and all parts of the writing, and every word in it, will, if possible, be given effect.") (citation omitted); *see also Weyerhaeuser Co. v. Carolina Power & Light Co.*, 257 N.C. 717, 719, 127 S.E.2d 539, 541 (1962); *Westinghouse Elec. Supply Co. v. Burgess*, 223 N.C. 97, 100, 25 S.E.2d 390, 392 (1943).

Consistently with the principles noted above, this Court has previously interpreted a contract term that purported to relieve a defendant of a payment obligation, like the TOA in this case, by examining all relevant language in the contract. In *Burgess*, for example, the Court applied the following rule:

"Great liberality is allowed in construing releases. The intent is to be sought from the whole and every part of the instrument; and where general words are used, if it appears by other clauses of the instrument, or other documents, definitely referred to, that it was the intent of the parties to limit the discharge to particular claims only, courts, in construing it, will so limit it. . . . In determining the effect of an instrument containing words that taken by themselves would operate as a general release, all the provisions of the instrument must be read together; and if on such reading an intent to limit the scope of the release appears, it will be restricted to conform to such intent."

223 N.C. at 100, 25 S.E.2d at 392 (alteration in original) (citation omitted).

Upon applying the appropriate rule, there is good reason to doubt the majority's interpretation of the parties' intent for the TOA. The first six "WHEREAS" clauses of the Trust Agreement make clear that Settlors' agreement to establish the Trust was a quid pro quo for the Grower States' release of claims for smoking-related health care costs and potential claims resulting from the adverse economic consequences of the MSA. Indeed, the Court acknowledged this quid pro quo in *Philip Morris I*:

Despite its cost, the Trust appealed to Settlors for financial reasons. Funding the Trust satisfied the requirement of the MSA "to address the economic concerns of the Grower States." In

other words, Settlors agreed to the Trust because doing so was a condition of the settlement that had relieved them of potentially bankrupting liability for smoking-related healthcare costs. Additionally, the Trust shields Settlors from claims the Grower States might otherwise bring for economic damages suffered as a result of the MSA.

*Philip Morris I*, 359 N.C. at 766, 618 S.E.2d at 221 (footnote omitted). Thus, at the very beginning of the Trust Agreement, the parties manifested an intention that the Trust should "provide aid to Tobacco Growers" and "Tobacco Quota Owners" in the several Grower States in exchange for those Grower States releasing Settlors from pending and potential tobacco-related claims.

Settlors bargained for separate releases with Maryland and Pennsylvania to achieve the same quid pro quo. Maryland and Pennsylvania's Attorneys General executed the releases "contemporaneously with and as a condition to the creation of the National Tobacco Grower Settlement Trust." As the Business Court noted, "It makes little sense that Maryland and Pennsylvania would execute releases of substantial claims in return for an agreement that payments to their farmers could be eliminated by payments to farmers in other states who were already receiving the benefits from the federal tobacco quota program." *State v. Philip Morris USA, Inc.*, No. 98 CVS 14377, 2007 WL 2570239, at *5 (Wake County Super. Ct. Aug. 17, 2007).

Also highly relevant, but scantily discussed in the majority opinion, are other provisions in the Trust Agreement and the TOA itself that contemplate a state-by-state application of adjustments and disbursements of the Trust funds. First, it is undisputed that Settlors make base payments to the Trust, which the Trustee then distributes to the several Grower States according to the percentages in Section 1.03, for further distribution to Tobacco Growers and Tobacco Quota Owners in each Grower State. This distribution schedule assigns to each Grower State a percentage of Settlor's allotted base payments, which percentage is distinct from that designated for every other Grower State. Thus, each of the beneficiary Grower States has a unique, quantifiable interest in the Trust funds. The majority's holding that Settlors are entitled to a complete offset of all amounts owed to the Trust because tobacco growers and quota holders in some Grower States receive FETRA assistance is therefore contrary to the Trust Agreement's distribution schedule.

STATE v. PHILIP MORRIS USA, INC.

[363 N.C. 623 (2009)]

Moreover, aside from the TOA, the parties included an MSA Finality Adjustment in the Trust Agreement that allowed Settlors a state-specific offset against amounts paid to the Trust if one or more Grower States failed to achieve eligibility for Trust payments as anticipated. The MSA Finality Adjustment reads as follows:

> MSA Finality Adjustment: In the event that a Grower State that is a Settling State under the MSA does not achieve State-Specific Finality on or before December 31, 2001 (or such later date as extended pursuant to . . . the MSA), or if there is an earlier final, non-appealable judicial determination that has the effect of precluding a Grower State from participating in the MBA [sic] (each event a "Non-Finality Event"), each Settlor shall be entitled to reduce its annual payment to the Trust after all other adjustments have been made for the year in which such a Non-Finality Event occurs, and in each subsequent year, by the same percentage as the pertinent Grower State's percentage allocation in Section 1.03. In addition, each Settl[o]r shall be entitled to reduce its annual payment for the year in which such a Non-Finality Event occurs (and, if necessary to obtain full credit, in subsequent years) by the amount of the Settlor's prior payments to the Trust allocated in the manner prescribed in Section 1.03 to the pertinent Grower State plus interest at the T-Bill Rate from the date the amount was paid to the Trust by the Settlor to the date the Settlor takes the credit for the amount.

Trust Agreement at A-12. So the parties clearly contemplated a state-by-state offset for Settlors should one or more Grower States not become eligible to participate in the Trust due to lack of finality under the MSA.

Finally, the parties included in the TOA a state-specific offset when a Grower State imposes on Settlors a governmental obligation. Upon such a Grower State-imposed governmental obligation, a Settlor may reduce its payment to the Trust by the percentage of the Settlor's base payment that is earmarked to that Grower State. *Id.* at A-8. The omission of a state-by-state offset from the portion of the TOA applying to a federal governmental obligation, however, does not necessarily indicate that the parties did not intend a state-by-state offset to apply to a federal governmental obligation. Particularly in light of other language in the Trust Agreement, the MSA, the individual releases, and the state-by-state application of other offset provisions, the lack of specific language applying a state-by-state offset to a federal governmental obligation only renders that part of the TOA

ambiguous. *See State v. Philip Morris USA Inc.*, —— N.C. App. ——, ——, 669 S.E.2d 753, 760 (2008) (Elmore, J., dissenting) ("The ambiguity, if there is any, arises here only in the context of whether the TOA provision explicitly mandates or prohibits a state-by-state accounting of reductions resulting from Grower Governmental Obligations. When the contract is read *as a whole*, however, it is clear that the parties intent was to protect tobacco farmers from the economic harm caused by the MSA.").

This Court's analysis of the very same TOA provision in *Philip Morris I* underscores the ambiguity in the federal component of the TOA. This Court rejected Settlors' argument that the TOA "is triggered whenever a change in law includes a financial obligation on Settlors earmarked to aid tobacco farmers." *Philip Morris I*, 359 N.C. at 777, 618 S.E.2d at 228. The Court observed that Settlors' argument

> "would allow a Tax Offset Adjustment even if the government never collects the assessments due under a qualifying change of law and hence never spends them for the benefit of tobacco farmers. Under those circumstances, tobacco farmers would receive reduced distributions (or no distributions) from the Phase II Trust and nothing from the government. The negative financial implications of this scenario for tobacco farmers are obvious."

*Id.*

Acknowledging that it was duty-bound to look beyond the "plain language" of the TOA, *see* 359 N.C. at 778, 618 S.E.2d at 228 (citing *Jones*, 222 N.C. at 413-14, 23 S.E.2d at 305), the Court rejected a reading of the TOA that was repugnant to the Trust's express purpose. The Court stated:

> Certainly the most compelling reason for rejecting the trial court's holding is that, taken to its logical extreme, it could defeat the express purpose of the Phase II Trust. As previously explained, the Trust was crafted to protect tobacco farmers from economic harm caused by the MSA . . . [through] a steady stream of supplemental income until at least 2010.
>
> . . . .
>
> . . . Interpreting the Trust Agreement in a manner that could leave those individuals without this extra income for years runs squarely counter to the express purpose of the Trust.

*Id.* at 779-80, 618 S.E.2d at 229.

Yet the majority's interpretation of the Trust Agreement in this case has precisely the result the Court found unacceptable in *Philip Morris I*. Considering all relevant language in the Trust Agreement and the parties' bargain in general, the only reasonable conclusion is that the parties did not intend that a governmental obligation compensating some Grower States' tobacco farmers could cut off Trust payments to tobacco farmers in other Grower States that receive no benefit from that governmental obligation. This outcome is contrary to the express purpose of the Trust and simply not consistent with the quid pro quo negotiated between the parties. To reach this result, the majority examines the TOA in a vacuum, ignoring that Settlors have all along dealt with the Grower States on a state-by-state basis. Accordingly, neither sound contract interpretation nor equity supports leaving tobacco growers in Maryland and Pennsylvania without governmental assistance or "a steady stream of supplemental income" from the Trust. *Id.* at 779, 618 S.E.2d at 229. Therefore, I respectfully dissent.

Justice HUDSON joins in this dissenting opinion.