HUNTER, JR., ROBERT N., Judge.
Bonnie G. Waters, Jr. ("Plaintiff") appeals the trial court's 20 June 2014 order granting summary judgment in favor of his sister, Patricia W. Peaks, in her individual capacity, in her capacity as executor of their mother's estate, and in her capacity as successor trustee of their parents' trust (collectively, "Defendants"). Defendants cross-appeal for failure to assess costs against Plaintiff. We affirm in part, and remand in part.
I. Factual & Procedural History
Bonnie G. Waters, Sr. and Ada L. Waters were married on 22 November 1956. Mr. Waters was a farmer and owned BGW Trucking Company and BGW Construction Company. Mr. and Mrs. Waters owned and operated the Waters Service Station on N.C. Highway 32 in Pinetown, as well as A & B Forestry, a contract land developer for Weyerhaeuser Company.
During the spring of 2005, Mr. and Mrs. Waters consulted with an estate planning attorney, Patrick Neighbors ("Attorney Neighbors"), to do comprehensive estate planning to preserve their assets. Subsequently, on 23 June 2005, Mr. and Mrs. Waters jointly executed a trust agreement entitled the "WATERS REVOCABLE LIVING TRUST" ("Waters Trust"), which provided for the use and disposition of their properties, both during their lifetimes and upon their death. The terms of the Waters Trust are the subject of this dispute.
According to the Waters Trust, Mr. and Mrs. Waters were to serve as initial trustees and beneficiaries during their lifetimes and, upon the death of both spouses, their daughter, Patricia, was designated as successor trustee, and their son, Plaintiff, was designated as alternate successor trustee. Mr. and Mrs. Waters transferred their assets into the Waters Trust by executing a "Bill of Sale," "Assignment of Motor Vehicles," and "Comprehensive Transfer Document." Simultaneously, Mr. and Mrs. Waters executed individual wills which contained pour-over provisions devising any assets owned by Mr. or Mrs. Waters at the time of his or her death into the Waters Trust.
The Waters Trust contained a plan of distribution for certain property assets that had been disclaimed by the surviving spouse and that had not already been given as a gift or otherwise satisfied by Mr. or Mrs. Waters by the time of death of the surviving spouse. That plan of distribution gave Plaintiff all real property located at Teach's Point, Bath, as well as the family home and Waters Service Station; it gave the "Wonderland" property equally to Plaintiff and Patricia; it gave all remaining real property to Patricia; and it split the net proceeds of the Waters Trust equally between Plaintiff and Patricia. According to Plaintiff, when Mr. Waters became sick in 2002, Mrs. Waters asked Plaintiff and his wife, Daisy Leigh, to help run Waters Service Station and told him to move into the house at Teach's Point to help out and also because he would eventually be inheriting the property.
Upon Mr. Waters' death on 25 January 2007, the Waters Trust contained the following pertinent real property assets, although the date on which the value reflected was determined is not apparent from the record on appeal:
 Description Acreage Tax Value Family Home on NC 32N .62 $90,166 Store and Barns on NC 32N 3.24 $60,463 1 block "Wonderland" 39.94 $86,462 1 block "Wonderland" 72.87 $157,223 1 block "Wonderland" 294.19 $635,451 1 block "Wonderland" 74.50 $160,741 1 block "Wonderland" 120.97 $260,133 Lots 15 & 16 Teach's Point 0.00 $171,868 Lot 17 Teach's Point 0.00 $31,701 Lot 1 Teach's Point Phase II 0.00 $23,400 
In early April 2007, Mrs. Waters consulted again with Attorney Neighbors to amend the Waters Trust. Although the briefs are silent as to Mrs. Waters' motivation for this amendment, materials in the record suggest around this time the relationship between Mrs. Waters and Plaintiff turned sour. Whatever her motivation, Mrs. Waters amended the Waters Trust on 11 April 2007 by eliminating Plaintiff as a beneficiary of the real property located at Teach's Point and substituting in lieu thereof his two children, Erica and Madison. Additionally, this amendment eliminated Plaintiff as a potential beneficiary of the family home and Waters Service Station and substituted in lieu thereof his sister, Patricia.
On 23 May 2007, Mrs. Waters consulted with a new attorney, Charles Edwards ("Attorney Edwards"), to discuss terminating Plaintiff and Daisy's occupancy of Teach's Point and Waters Service Station. Shortly thereafter, Mrs. Waters initiated a summary ejectment action against Plaintiff and Daisy to remove them from Waters Service Station and the property at Teach's Point; around the same time, Plaintiff sued his mother for alleged improvements to the property located at Teach's Point. In June 2007, during a meeting with Attorney Edwards concerning this litigation against Plaintiff, Mrs. Waters decided to make another amendment to the Waters Trust detrimental to Plaintiff. Rather than consult with Attorney Neighbors to draft this amendment, Mrs. Waters sought Attorney Edwards' legal services. Indeed, Mrs. Waters subsequently consulted with Attorney Edwards several times over the next few years for additional estate planning.
On 18 June 2007, Mrs. Waters amended the Waters Trust to "purposefully and intentionally remove [Plaintiff] as a beneficiary[,]" as well as remove Plaintiff as alternate successor trustee of the Waters Trust. This amendment also gave all real property located at Teach's Point to Patricia, as trustee, to hold in trust for the benefit of Plaintiff's children, Erica and Madison Waters, until they reached adulthood. Additionally, this amendment removed Plaintiff's beneficial interest in the "Wonderland" property and gave it fully to Patricia.
Around June 2008, Mrs. Waters amended the Waters Trust to remove Erica and Madison Waters as beneficiaries of the Teach's Point property and substituted Patricia in their stead. Additionally, this amendment gave all real property located on N.C. Highway 171 near Washington to Patricia, as trustee, to hold for the benefit of Erica and Madison Waters, until the younger reached age twenty-one. Around August 2009, Mrs. Waters amended the Waters Trust by removing Erica and Madison Waters as beneficiaries of the real property located at N.C. Highway 171 and substituted Patricia in lieu thereof. Furthermore, this amendment "purposefully and intentionally" removed Mrs. Waters' seven grandchildren, leaving Patricia as the only beneficiary. In early March 2011, Mrs. Waters executed a gift deed conveying all of the real property located at Teach's Point to Patricia.
Mrs. Waters died on 24 January 2013. Upon Mrs. Waters' death, Patricia became executor of her estate and trustee of the Waters Trust. By will executed 23 June 2005, Mrs. Waters bequeathed all remaining assets to the trustee of the Waters Trust, Patricia. By deed dated 12 February 2013, Patricia, as trustee of the Waters Trust, conveyed all remaining real property in the Waters Trust to herself in her individual capacity.
On 25 March 2013, Plaintiff sued Defendants, asserting ten claims for relief, as follows: (1) "Breach of Fiduciary Duties, Recovery of Attorney Fees and Return of Commissions"; (2) "Action for Declaratory Judgment, Setting Aside Conveyances and Transferring Property to Plaintiff or in the Alternative Compelling Fiduciary to Perform Duties"; (3) "Constructive Fraud and Unjust Enrichment"; (4) "Request for the Removal of the Successor Trustee and Appointment of new Successor Trustee or in the Alternative Appointment of an Independent Special Fiduciary"; (5) "Request for Audit and Inspection of Properties and Records"; (6) "Civil Conspiracy"; (7) "Punitive Damages"; (8) "Breach of Contract and Specific Performance"; (9) "Wrongful Conversion"; and (10) "Intentional Interference with Expected Inheritance." Included within Plaintiff's complaint was a request for preliminary injunction enjoining Patricia from transferring any property held in the Waters Trust.
On 14 May 2013, Defendants filed an answer and asserted ten motions to dismiss which, although the order is missing from the record, presumably were denied. On 11 July 2013, Defendants served Plaintiff with responses to interrogatories and requests for production of documents. On 12 August and 18 November 2013, Defendants served Plaintiff with supplemental responses to his discovery requests. On 22 November 2013, Plaintiff filed a motion to compel Defendants to "appropriately respond to Plaintiff's First set of Interrogatories and Requests for Production of Documents."
On 2 December 2013, Plaintiff's motion to compel and motion for preliminary injunction were heard in Beaufort County Superior Court before the Honorable Wayland J. Sermons, Jr. By orders entered 3 January 2014, Judge Sermons, Jr. granted Plaintiff's motions for preliminary injunction and to compel, ordering Defendants to "fully respond to Plaintiff's Interrogatories and Requests for Production of Documents[.]" On 27 January 2014, Defendants served Plaintiff with "Defendants' Supplemental Discovery Responses Pursuant to Order Granting Motion to Compel filed January 3, 2014."
On 15 April 2014, Defendants filed a motion for summary judgment. On 24 April 2014, Plaintiff filed a motion for summary judgment. On 30 April 2014, Plaintiff filed another motion to compel and a motion for sanctions based on Defendants' alleged failure to comply with the trial court's 3 January 2014 order compelling discovery. The cross motions for summary judgment, motion to compel, and motion for sanctions were scheduled to be heard at the 5 May 2014 Civil Session of Beaufort County Superior Court before the Honorable Kenneth C. Titus. After beginning to hear both parties' arguments, Judge Titus, unable to tell if Defendants adequately complied with Judge Sermons, Jr.'s 3 January 2014 order compelling discovery, did not rule on any motions and rescheduled the matter for another hearing before Judge Sermons, Jr.
On 17 June 2014, the matter came on before Judge Sermons, Jr. and by orders entered 20 June 2014, the trial judge (1) granted Defendants' motion for summary judgment-but refused to tax costs against Plaintiff; (2) dissolved the preliminary injunction granted in favor of Plaintiff; (3) stayed the judgment pending resolution of Plaintiff's appeal; and (4) denied Plaintiff's motions to compel and for sanctions.
Plaintiff appealed the trial court's order granting summary judgment in favor of Defendants. Defendants cross-appealed the summary judgment order on the ground the trial court erred by refusing to tax costs against Plaintiff.
II. Analysis
A. Plaintiff's Appeal
Plaintiff contends the trial court erred by granting Defendants' motion for summary judgment as to all ten claims for relief. We disagree.
"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that 'there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.' " In re Will of Jones,362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (quoting Forbis v. Neal,361 N.C. 519, 524, 649 S.E.2d 382, 385 (2007) ).
When reviewing a trial court's allowance of a summary judgment motion, we consider whether, on the basis of materials supplied to the trial court, there was a genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. Evidence presented by the parties is viewed in the light most favorable to the non-movant.
Davenport v. Cent. Carolina Bank & Trust Co.,161 N.C.App. 666, 671, 589 S.E.2d 367, 370 (2003) (citing Summey v. Barker,357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003) ).
The linchpin of all Plaintiff's claims for relief is the interpretation of the Waters Trust. If Mrs. Waters could legally amend the Waters Trust, then all of Plaintiff's remaining claims fail. They fail because if Patricia as the trustee was merely executing the grantors' wishes and not breaching her fiduciary duty, Plaintiff's claims have no merit and are subject to dismissal on summary judgment.
Plaintiff's second claim seeks a declaratory judgment interpreting the terms of the Waters Trust. Plaintiff contends Mr. and Mrs. Waters intended the plan of distribution of certain real property contained within the Waters Trust to become unamendable upon the death of the first spouse and, therefore, Plaintiff contends any subsequent amendments by the surviving spouse altering that plan were void. Whether the distribution plan remained amendable after Mr. Waters' death requires this Court to construe the Waters Trust.
Interpreting the terms of an express trust "is a case of contract interpretation, and [this Court's] review is de novo." State v. Philip Morris USA Inc.,363 N.C. 623, 631, 685 S.E.2d 85, 90 (2009).
When called upon to interpret a trust agreement or other contract, courts seek to ascertain the intent of the parties and, when ascertained, give effect thereto, unless forbidden by law. The intent of one who creates a trust is to be determined by the language he chooses to convey his thoughts, the purpose he seeks to accomplish, and the situation of the several parties to or benefited by the trust.
Callaham v. Newsom,251 N.C. 146, 149, 110 S.E.2d 802, 804 (1959) (citations omitted). "A contract which is plain and unambiguous on its face will be interpreted as a matter of law by the court." Dep't. of Transp. v. Idol,114 N.C.App. 98, 100, 440 S.E.2d 863, 864 (1994). "If the agreement is ambiguous, however, interpretation of the contract is a matter for the jury." Dockery v. Quality Plastic Custom Molding, Inc.,144 N.C.App. 419, 422, 547 S.E.2d 850, 852 (2001) (citation omitted). "[A]mbiguity exists where the language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties." Glover v. First Union Nat'l Bank,109 N.C.App. 451, 456, 428 S.E.2d 206, 209 (1993).
Here, Plaintiff directs this Court's attention to two provisions in support of his proposition that Mr. and Mrs. Waters intended for the Waters Trust to be unamendable upon the death of the first spouse: first, Article II(B)(1)(a), which states "the plan of distribution and all terms of this Credit Shelter Trust shall be irrevocable and unamendable upon the death of either grantor [;]" second, Article II(C)(2), which states "[p]roceeds remaining after the previous provisions have been complied with shall be distributed pursuant to the plan of distribution of the Credit Shelter Trust assets upon the death of the second grantor, which provisions are herein incorporated by reference." Plaintiff contends "since the plan of distribution in Article [II]C of the Waters Trust calls for incorporation by reference of the plan of distribution in the Credit Shelter Trust, the plan of distribution in both Sections became 'irrevocable and unamendable upon the death of either grantor.' " We are not persuaded.
Article II of the Waters Trust is listed more fully below with emphasis added:
A. ALLOCATION OF ASSETS UPON DEATH OF ONE SPOUSE:
Upon the death of either of us, the assets of this living trust shall remain in the living trust with the surviving grantor as primary trustee and primary beneficiary except that the survivor of us shall have the right to disclaim all or any part of the deceased spouse's interest in the assets of this living trust. Said assets disclaimed shall be selected by the survivor out of the assets of this living trust including, but not limited to any assets gifted, transferred or poured over into this living trust at any time. Upon said disclaimer of assets by the surviving spouse, the disclaimed whole or portion shall be distributed to and administered pursuant to the provisions for the Non-Marital Share as described hereunder.
B. NON-MARITAL SHARE
1. Upon disclaimer of assets pursuant to the previous provisions, the disclaimed whole or portion shall be distributed to a separate trust, hereinafter referred to as the Credit Shelter Trust, to be held and administered as follows:
a. The survivor of us and PATRICIA W. PEAKS shall be co-trustees of the Credit Shelter Trust and shall be entitled to manage the assets of the Credit Shelter Trust, but the plan of distribution and all terms of this Credit Shelter Trust shall be irrevocable and unamendable upon the death of either grantor....
....
2. Upon the death of the survivor of us, the assets then remaining in this Credit Shelter Trust shall be distributed as follows:
a. If the gift(s) described hereunder are fully satisfied from the assets of the [Waters Trust], then the following described specific gift(s) shall be and void. If the following described specific gift(s) are partially satisfied from the assets of the [Waters Trust], then the following provision shall be effective only to the extent of the portion not already satisfied. The following provision shall in no way be construed to provide for duplicate specific gifts from both Credit Shelter Trust and other living trust assets.
b. We give all real property located at Teach's Point, Bath, North Carolina to [Plaintiff].
c. We give real property, located on NC Hwy 32, including both the store and home to [Plaintiff]. Said property is described at Book 806, Page 74, Beaufort County Registry, and Book 479, Page 273, Beaufort County Registry.
d. We give real property, known as the "Wonderland Property" to PATRICIA W. PEAKS and [Plaintiff]. Said property is described at Book 692, Page 98, Beaufort County Registry.
e. We give all remaining real property to PATRICIA W. PEAKS.
....
g. The net proceeds of this trust shall be divided between our children, PATRICIA W. PEAKS and [Plaintiff], in equal shares....
....
C. PLAN OF DISTRIBUTION UPON DEATH OF SURVIVOR:
1. Upon the death of the survivor of us, our successor trustee(s) shall take charge of the assets then remaining in this trust[.] ...
a. Our children are PATRICIA W. PEAKS and [Plaintiff]. Any children born after the date of this trust shall be treated as though they were named with other children in the provisions of this trust.
b. We direct that our successor trustee(s) divide our personal effects, including automobiles, boats, sporting equipment, jewelry, furniture, furnishings, china, glassware, silver and household equipment (except those items which are specifically given to a beneficiary elsewhere in this trust agreement in which case said specific gift shall take precedence over this paragraph), among our children or their issue by representation as they may agree or, failing such agreement, in such manner as our successor trustee(s) may deem equitable. If our children or their issue by representation do not agree, we give our successor trustee(s) full discretion to determine the division and distribution of the articles above referred to between our children or their issue by representation, and such determination shall be binding on all persons....
2. Proceeds remaining after the previous provisions have been complied with shall be distributed pursuant to the plan of distribution of the Credit Shelter Trust assets upon the death of the second grantor, which provisions are herein incorporated by reference.
After reading these provisions in context, two things fatal to Plaintiff's argument become apparent. First, the distribution plan pertains only to those assets specifically disclaimed and, consequently, distributed into the Credit Shelter Trust, a separate trust account. Therefore, the provision indicating "the plan of distribution of the Credit Shelter Trust assets ... [is] herein incorporated by reference" is of no consequence to assets not disclaimed. Second, the language Plaintiff references concerning the plan of distribution and terms that become "irrevocable and unamendable upon the death of either grantor" similarly pertains only to disclaimed assets that have been distributed into the Credit Shelter Trust and have not been satisfied from the assets of the Waters Trust. Furthermore, the plan of distribution "shall be and void" if the gifts described are satisfied before the death of the surviving spouse.
In construing the entire trust, we believe the plain language of the Waters Trust unambiguously supports Defendants' and the trial court's interpretations that Mr. and Mrs. Waters intended for the Waters Trust to remain amendable upon the death of the first spouse, as well as the interpretation that the provision limiting the amendability of the plan of distribution referenced in Article II pertained only to those assets existing in the Credit Shelter Trust, if it were created.
Our conclusion is bolstered by other terms and provisions of the Waters Trust. For instance, Article I(B) (emphasis added) provides in pertinent part:
Upon the death of one of us, the survivor shall continue to act as the primary trustee of this living trust, with full power and authority to deal with any and all of the assets of this trust in any manner that said survivor sees fit,except as hereinafter limited as to assets placed in a secondary trust within this living trust to be known as the Credit Shelter Trust, and except as otherwise limited under Articles Two and/or Three of this living trust....
Additionally, Article III (emphasis added) contains an entire subheading entitled "Power to Amend," which provides in pertinent part with emphasis added:
B. POWER TO AMEND:
After the death of the first grantor to die, the surviving grantor may amend the trust, in whole or in part,by an instrument in writing, signed by the surviving grantor and delivered to all acting trustee(s) (which may be the surviving grantor) except as may be limited by Article One or Two of this Declaration of Trust.
As to assets of the Waters Trust not disclaimed and, therefore, not distributed into the Credit Shelter Trust, Article II provides:
Upon the death of either of us, the assets of this living trust shall remain in the living trust with the surviving grantor as primary trustee and primary beneficiary[.]
Plaintiff concedes Mrs. Waters never disclaimed any property. Accordingly, no assets from the Waters Trust were ever distributed into the Credit Shelter Trust. Therefore, the provisions governing the plan of distribution of assets of the Credit Shelter Trust never came into effect-nor did the irrevocable or unamendable language contained therein expand to affect the plan of distribution of assets in the Waters Trust. Because all assets held in the Waters Trust upon Mr. Waters' death remained, the terms and provisions in Article III that provided unambiguously for the surviving grantor to amend the Waters Trust upon the death of the first spouse remained effective. It follows, therefore, amendments to the Waters Trust executed by Mrs. Waters after Mr. Waters' death were valid. When Mrs. Waters amended the Waters Trust on 18 June 2007, she effectively removed Plaintiff as a beneficiary and terminated his beneficial interest in the Waters Trust.
It is true the Credit Shelter Trust plan of distribution listed in Article II(B)(2), discussed above, contemplated a more equal distribution of assets between Plaintiff and Patricia. However, because Mrs. Waters never disclaimed any assets, the Credit Shelter Trust and its plan of distribution never came into existence. Therefore, Mrs. Waters was free to amend the Waters Trust after Mr. Waters' death. Furthermore, because the gifts provided for in the Credit Shelter Trust plan of distribution were fully satisfied by Mrs. Waters before her death, the plan of distribution as to those specific gifts was " and void." Additionally, the provision providing "[p]roceeds remaining after the previous provisions have been complied with shall be distributed pursuant to the plan of distribution of the Credit Shelter Trust assets upon the death of the second grantor" had no effect because there were no proceeds remaining.
Because we conclude the Waters Trust was amendable upon Mr. Waters' death, the trial court correctly granted summary judgment in favor of Defendants as to Plaintiff's second claim for relief. Because Plaintiff's remaining nine claims for relief depend upon the presumptions that either Mrs. Waters was without authority to amend the Waters Trust or that Patricia acted improperly as trustee of the Waters Trust or executor of Mrs. Waters' estate, Plaintiff's remaining claims necessarily fail, for Plaintiff's beneficial interest in the Waters Trust had been effectively terminated by Mrs. Waters' valid amendments. Therefore, we affirm the trial court's grant of summary judgment in favor of Defendants as to all claims and need not discuss Plaintiff's remaining challenges. See Shore v. Brown,324 N.C. 427, 428, 378 S.E.2d 778, 779 (1989) ("If the granting of summary judgment can be sustained on any grounds, it should be affirmed on appeal.").
Furthermore, because we conclude summary judgment was appropriate at this stage of the proceedings, we dismiss Plaintiff's challenge as to the issue of whether the trial court erred by granting Defendants' motion for summary judgment before Defendants fully complied with the trial court's 3 January 2014 order granting Plaintiff's motion to compel. See North Carolina Council of Churches v. State,120 N.C.App. 84, 93, 461 S.E.2d 354, 360 (1995) ("Since summary judgment was proper on the materials presented at this stage of the proceedings, we need not further address plaintiffs' assertion that the court erred by refusing to compel discovery.").
B. Defendants' Appeal
Defendants filed a cross-appeal. The cross-appeal contends the trial court erred by failing to tax costs against Plaintiff pursuant to N.C. Gen.Stat. § 6-19 and 7A-305(d), and by declining to award attorneys' fees to Defendants. Because the record makes clear the trial judge declined to make a decision to tax costs, including reasonable attorneys' fees, if any, we remand to the trial court with instructions to make additional findings on these issues.
The trial transcript reveals that, after the trial judge orally granted Defendants' motion for summary judgment, he stated: "I'm granting summary judgment on all claims for the defendant which puts you out of court and let's [sic] you go to the Court of Appeals and have three other legal minds and a bunch of law clerks decide whether this is the right way or the wrong way." The trial judge then requested Defendants write the order and instructed: "[S]tate that the Court grants summary judgment for the defendants on all the plaintiff's issues and that way all of them can go up. All of them can be briefed, and the Court of Appeals can tell us what, if any, of them survived to come back for trial." Defendants asked: "Does the Court care to address attorney's fees?" The trial judge responded: "No. I'm not going there.... I'm not awarding anybody attorney's fees at this point." The transcript reveals no other discussion of costs.
On 20 June 2014, Defendants filed with the trial court a notice of expenses and costs incurred, including the following: (1) fees of a mediator; (2) expenses for deposition transcripts of Attorney Neighbors; (3) expenses for deposition transcripts of Attorney Edwards; and (4) expenses for deposition transcripts of Patricia. Also on 20 June 2014, the trial court entered its order granting summary judgment for Defendants, which provided in pertinent part: "[S]ummary judgment is granted in favor of Defendants against Plaintiff and that this action is dismissed with prejudice with the costs to be taxed against the Plaintiff." However, the trial judge crossed out "with the costs to be taxed against the Plaintiff."
Because the trial judge declined to rule on these issues and the resolution of these issues requires fact finding on matters outside of the record, we remand these issues to the trial court with instructions to resolve the matters of taxing costs, including a resolution of whether attorneys' fees should be included as costs. Therefore, we recommend the trial court "go[ ] there" on remand.
III. Conclusion
Based upon the foregoing, we affirm the trial court's order granting summary judgment in favor of Defendants and remand for proceedings not inconsistent with this opinion.
AFFIRMED IN PART; AND REMANDED IN PART.
Judges STEELMAN and DAVIS concur.
Report per Rule 30(e).
Judge STEELMAN concurred in this opinion prior to 30 June 2015.
Opinion
Appeal by Plaintiff from order entered 20 June 2014 by Judge Wayland J. Sermons, Jr. in Beaufort County Superior Court. Heard in the Court of Appeals 20 May 2015.