Volvo Grp. N. Am., LLC v. Roberts Truck Ctr., Ltd., 2020 NCBC 28.

STATE OF NORTH CAROLINA

GUILFORD COUNTY

VOLVO GROUP NORTH AMERICA,
LLC d/b/a VOLVO TRUCKS NORTH
AMERICA, a Delaware limited liability
company; and MACK TRUCKS, INC., a
Pennsylvania corporation,

        Plaintiffs,

    v.

ROBERTS TRUCK CENTER, LTD., a
Texas limited partnership; ROBERTS
TRUCK CENTER OF KANSAS, LLC, a
Kansas limited liability company; and
ROBERTS TRUCK CENTER
HOLDING COMPANY, LLC, a Texas
limited liability company,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
19 CVS 2981

**ORDER AND OPINION ON
PLAINTIFFS' MOTIONS FOR
JUDGMENT ON THE PLEADINGS
AND TO DISMISS DEFENDANTS'
COUNTERCLAIMS**

1. THIS MATTER is before the Court on Plaintiffs Volvo Group North America, LLC d/b/a Volvo Trucks North America's ("Volvo") and Mack Trucks, Inc.'s ("Mack") separate motions for judgment on the pleadings, and Plaintiffs' joint Motion to Dismiss Defendants' Counterclaims (collectively the "Motions"). After considering the Motions, the briefs in support of and in opposition to the Motions, and the arguments of counsel at a hearing held on September 5, 2019, for the reasons discussed below, the Court GRANTS Mack's Motion for Judgment on the Pleadings and Motion to Dismiss Defendants' Counterclaims, DENIES Volvo's Motion for Judgment on the Pleadings, GRANTS in part and DENIES in part Volvo's Motion to Dismiss Defendants' Counterclaims, and severs for early determination the dispute

regarding the applicable 2017 Volvo sales quota (the "Severed Issue"). The Court DEFERS further proceedings until the Severed Issue is determined.

> *Kilpatrick Townsend & Stockton LLP, by Chad D. Hansen & Richard Keshian, and Baker Hostetler, LLP, by Billy M. Donley, James Keith Russell, and William Geise, for Plaintiffs Volvo Grp. N. Am., LLC d/b/a Volvo Trucks N. Am. & Mack Trucks, Inc.*

> *Johnson, Hearn, Vinegar & Gee, PLLC, by Richard Vinegar, and Hiersche, Hayward, Drakeley & Urbach, P.C., by Laurie Patton & James Drakeley, and Barnes Law Offices, LLC, by Patrick R. Barnes, for Defendants Roberts Truck Ctr. of Kansas, LLC, Roberts Truck Ctr. Ltd., & Roberts Truck Ctr. Holding Co., LLC.*

Gale, Judge.

## I.  INTRODUCTION

2.  Defendants Roberts Truck Center, Ltd.; Roberts Truck Center of Kansas, LLC; and Roberts Truck Center Holding Company, LLC (collectively "Roberts" or "Defendants") have franchise and related agreements with Plaintiffs to operate truck dealerships in Kansas. This litigation arises from Plaintiffs' efforts to terminate those agreements through the enforcement of a settlement agreement entered to resolve Kansas administrative proceedings Defendants brought to challenge any such termination (the "Settlement Agreement" or "Agreement").

3.  The Settlement Agreement established sales targets for Mack and Volvo trucks over a two-year period, with an agreement that Defendants' franchise agreements with either Plaintiff would be terminated if Defendants failed to meet their sales target with respect to either Mack or Volvo. Plaintiffs contend and Defendants deny that Defendants did not meet their respective sales goals for Mack and Volvo. Alternatively, Defendants contend in their counterclaims that, on the one

hand, they substantially complied with the terms of the Settlement Agreement, or on the other, any failure to comply was caused by Plaintiffs taking action that frustrated Defendants' ability to perform.

4.     Additionally, the parties dispute which state's law applies, that determination potentially impacting the outcome of the Motions.  Defendants are Kansas dealers with no operations in North Carolina and brought their Kansas administrative proceedings based on Kansas laws governing Kansas dealers. However, the Settlement Agreement provides that it will be interpreted and enforced pursuant to North Carolina law, the situs of Plaintiffs' principal places of business. Defendants contend that this choice of law provision mandates that the protective provisions of the North Carolina Motor Dealers and Manufacturers Licensing Law, North Carolina General Statutes Chapter 20, Article 12, (the "Dealer Act" or the "Act"), then preclude termination of the franchise agreements and mandate a more lenient standard of performance than the Settlement Agreement itself calls for. Plaintiffs contend that the Dealer Act does not apply to vary the contractual terms to which the parties agreed.

5.     The Court concludes that the Dealer Act does not apply, and the Settlement Agreement should be interpreted and enforced in accordance with its terms.  As a result, Defendants' defenses or counterclaims survive only to the extent they do not presuppose application of the Dealer Act.

6.     The Court further concludes that Mack is entitled to enforce the Settlement Agreement, as a matter of law, and to have all counterclaims against it dismissed.

7.     As to Volvo, the Court concludes that the Severed Issue—the issue as to what 2017 sales target should be applied—is disputed, and that Defendants' defenses and counterclaims depend upon the Severed Issue's resolution in their favor because, if the 2017 sales target is as Volvo contends, Volvo would be entitled to enforce the Settlement Agreement and terminate Defendants' dealership without further proceedings. Certain of Defendants' counterclaims against Volvo should be dismissed no matter what the 2017 Volvo sales target is determined to be. The Severed Issue concerning the 2017 Volvo sales target shall be set for early determination.

## II.     FACTUAL BACKGROUND

8.     The Court draws the factual background from the allegations of Plaintiffs' Complaint to which Defendants have admitted, and incorporated documents, the authenticity of which Roberts has admitted. (Compl., ECF No. 3; Answer, ECF No. 41.) Unless noted otherwise, allegations to which the Court cites are uncontested.

9.     Volvo is a limited liability company organized under the laws of Delaware, with its principal place of business in Greensboro, North Carolina. (Compl. ¶ 1.) Mack, incorporated under the laws of Pennsylvania, is Volvo's sole member and also maintains its principal place of business in Greensboro, North Carolina. (Compl. ¶ 2.)

10. Volvo and Mack manufacture Class 8 trucks that are marketed at retail through a network of authorized dealers. (Compl. ¶ 12.)

11. Roberts Truck Center of Kansas, LLC is a limited liability company organized under the laws of Texas, with its principal place of business in Kansas. (Compl. ¶ 3.)

12. Roberts Truck Center Ltd. is a limited partnership organized under the laws of Kansas, with its principal office in Texas. (Compl. ¶ 4.)

13. Roberts Truck Center Holding Company, LLC, doing business as the Summit Truck Group, is a limited liability company organized under the laws of Texas, with its principal office in Tennessee. (Compl. ¶ 5.)

14. On September 1, 2010, Volvo entered into a Dealer Sales and Service Agreement ("Volvo Dealer Agreement") with Roberts, which appointed Roberts as an independent, authorized retail dealer of Volvo products within its geographical area of responsibility. (Compl. ¶ 13; Volvo Dealer Agreement, ECF No. 9.)

15. On September 1, 2012, Mack entered into a Dealer Sales and Service Agreement with Roberts ("Mack Dealer Agreement") (together with the Volvo Dealer Agreement, the "Dealer Agreements"), which appointed Roberts as an independent, authorized retail dealer of Mack products within its geographical area of responsibility. (Compl. ¶ 14; Mack Dealer Agreement, ECF No. 10.)

16. On October 29, 2013, Mack notified Roberts of its contention that Roberts was in breach of the Mack Dealer Agreement due to its failure to meet sales

and service obligations, and provided Roberts over a year to cure the asserted breach. (Compl. ¶¶ 18–19; Mack Notice Breach, ECF No. 12.)

17. Similarly, on January 31, 2014, Volvo notified Roberts of its contention that Roberts was in breach of the Volvo Dealer Agreement due to its failure to meet sales and service obligations, and provided Roberts over a year to cure the asserted breach. (Compl. ¶¶ 15–16; Volvo Notice Breach, ECF No. 11.)

18. On March 17, 2015, by separate letters, Volvo and Mack notified Roberts of their intention to terminate the Dealer Agreements after the expiration of a ninety-day notice period required by Kansas law. (Compl. ¶ 21.)

19. Roberts thereafter filed two administrative protests with the Kansas Department of Revenue seeking to prevent the termination of the Dealer Agreements. (Compl. ¶ 22.)

20. The parties entered into the Settlement Agreement, effective January 13, 2016. (Compl. ¶ 23.)

21. In addition to setting sales targets for the two-year period from 2016 through 2017 in the Settlement Agreement, the parties agreed that:

   a. The Settlement Agreement was reached through arms-length negotiations with each party having the benefit of advice of attorneys. (Compl. ¶ 24; Settlement Agreement 2–3.)

   b. Roberts had failed to perform under the applicable Dealer Agreements, Volvo and Mack had good cause to terminate the agreements, and Volvo and Mack had satisfied all conditions

precedent to termination, including providing effective notice and an adequate cure period. (Settlement Agreement ¶ 1.)

c.     Roberts would dismiss the pending Kansas protest proceedings. (Settlement Agreement ¶ 2.)

d.     The agreed sales numbers necessary to avoid termination must be met "without qualification," and the sales goals would be measured by "strict compliance" so that termination may follow a failure "to achieve the agreed sales numbers . . . by even one new truck." (Settlement Agreement ¶ 3.)

e.     If those agreed sales numbers over the two years following the Settlement Agreement were not met, Roberts would voluntarily sell the dealerships or surrender the Dealer Agreements. (Settlement Agreement ¶ 4.)

f.     A truck sale must satisfy two criteria to be counted toward the sales quota. First, the sale must be within the Area of Responsibility ("AOR") as defined by the pertinent Dealer Agreement. Second, (1) the truck must have actually been sold by Roberts; (2) the truck must have been delivered to the customer; and (3) the warranty must have been registered by the last date of the year for which credit was to be applied. (Settlement Agreement ¶ 3.)

g. Volvo and Mack provided adequate additional consideration to support the Settlement Agreement and its termination provisions as required to be enforceable under Kansas law. (Settlement Agreement ¶ 5.)

h. North Carolina law governs the validity, effect, and construction of the Settlement Agreement. (Settlement Agreement ¶ 9.)

i. The rule of construing the agreement against its drafter will not be applied. (Settlement Agreement ¶ 10.)

j. The Settlement Agreement does not violate the Kansas dealer statute pursuant to which the protest proceedings had been brought. (Settlement Agreement ¶ 12.)

k. There are no further agreements outside the four corners of the Settlement Agreement and all negotiations were merged into the Settlement Agreement. (Settlement Agreement ¶¶ 15–16.)

22. The Settlement Agreement set initial sales targets for the years 2016 and 2017 and a mechanism by which they could be adjusted, first for any national market sales trends, and second by carrying forward any shortage in 2016 to the target for 2017. The targets would be adjusted upwards or downwards if new Class 8 truck sales in the United States as a whole increased or decreased by 20% or greater. (Settlement Agreement ¶ 3.) Further, as long as 85% of the sales target was met in 2016, any shortage from the sales target would be carried over to 2017.

(Settlement Agreement ¶ 3.) Any variation was to be determined separately for the stated goals for Volvo and Mack trucks. (Settlement Agreement ¶ 3.)

23. The initial sales targets for the years 2016 and 2017 set by the Settlement Agreement were:

| 2016 | | |
|---|---|---|
| | Volvo trucks: | 35 |
| | Mack trucks: | 25 |
| 2017 | | |
| | Volvo trucks: | 48 |
| | Mack trucks: | 37 |

(Settlement Agreement ¶ 3.)

24. The 2016 targets were adjusted for national market changes to become:

| Volvo trucks: | 27 |
|---|---|
| Mack trucks: | 19 |

25. There was no national market change that required a change in the 2017 sales quotas.

26. The parties agreed that shortages of sales required by the 2016 quota, if any, would be carried forward and added to the 2017 quota. Volvo and Mack contend, and Defendants deny, that Roberts failed to satisfy the 2016 quotas, so that the 2017 sales quotas were increased.

27. Volvo and Mack each notified Roberts by letters dated March 19, 2018 that Roberts had failed to meet the agreed sales numbers for 2017 and therefore had defaulted on its Settlement Agreement obligations. (Volvo Notice Default, ECF No. 13; Mack Notice Default, ECF No. 14.) Volvo and Mack provided Roberts 180 days within which to secure an approved buyer or buyers for its Volvo and Mack

dealerships. (Compl. ¶ 44; Volvo Notice Default; Mack Notice Default.) Roberts did not secure an approved buyer within that period. (Compl. ¶ 47.)

28. Volvo and Mack each sent Roberts a letter dated December 13, 2018 requesting Roberts to voluntarily terminate and relinquish its Dealer Agreements within three business days, (Compl. ¶ 49; Volvo Notice Termination, ECF No. 15; Mack Notice Termination, ECF No. 16), which Roberts did not do, (Compl. ¶ 50).

29. Volvo and Mack now seek specific performance of the Settlement Agreement and a declaration of their right to terminate the Dealer Agreements. Roberts asserts affirmative defenses and counterclaims, which Volvo and Mack seek to dismiss.

### III. PROCEDURAL BACKGROUND

30. On January 29, 2019, Plaintiffs filed their Complaint stating claims for breach of the Settlement Agreement and requesting specific performance and a declaratory judgment. (Compl. ¶¶ 55–70.)

31. The case was designated as a mandatory complex business case pursuant to section 7A-45.4(a) of the North Carolina General Statutes by the Chief Justice and assigned to the undersigned on January 30, 2019. (Designation Order, ECF No. 1; Assignment Order, ECF No. 2.)

32. On April 3, 2019, Roberts filed its answer and counterclaims for breach of contract, equitable and promissory estoppel, breach of express and implied covenants and agreements, unconscionability, declaratory relief, injunctive relief and permanent injunction, and unfair or deceptive trade practices. (Answer 21–28.)

33. On May 24, 2019, Plaintiffs moved to dismiss Defendants' counterclaims. (Mot. Dismiss Defs.' Countercls., ECF No. 68.)

34. On July 16, 2019, Volvo and Mack separately moved for judgment on the pleadings. (Pl. Mack's Mot. J. Pleadings, ECF No. 81; Pl. Volvo's Mot. J. Pleadings, ECF No. 83.)

35. On September 5, 2019, the Court heard oral argument on the Motions. (*See* Notice Case Management Conference & Hr'g, ECF No. 85.)

36. The Motions are now ripe for resolution.

## IV. STANDARD OF REVIEW

37. It is proper to dismiss a counterclaim under Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rules") when the counterclaim discloses on its face (1) that no law supports the claim; (2) an absence of facts sufficient to make a good claim; or (3) facts which necessarily defeat the claim. *Blow v. DSM Pharms., Inc.*, 197 N.C. App. 586, 588, 678 S.E.2d 245, 248 (2009) (citing *Johnson v. Bollinger*, 86 N.C. App. 1, 4, 356 S.E.2d 378, 380 (1987)). When ruling on a Rule 12(b)(6) motion, a court may consider documents attached to or incorporated into the challenged pleading without converting the motion to one for summary judgment. *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 40, 742 S.E.2d 287, 291 (2013) (quoting *Weaver v. Saint Joseph of the Pines, Inc.*, 187 N.C. App. 198, 203–04, 652 S.E.2d 701, 707 (2007)). Where the pleading relies on a document, the actual content of the

document controls over inconsistent allegations. *Charlotte Motor Speedway, LLC v. Cty. of Cabarrus*, 230 N.C. App. 1, 6, 748 S.E.2d 171, 176 (2013) (citation omitted).

38. A Rule 12(c) motion is governed by the same standard of review but differs in that the motion may be based on pleadings beyond the complaint. *A-1 Pavement Marking, LLC v. APMI Corp.*, 2008 NCBC LEXIS 15, at \*7 (N.C. Super. Ct. Aug. 4, 2008) (citation omitted). Well-pleaded facts and inferences are accepted in favor of the party opposing the motion, but again only so long as those allegations and inferences are not contradicted by the documents upon which the pleading is based. *Praxair, Inc. v. Airgas, Inc.*, 1999 NCBC LEXIS 5, at \*8 (N.C. Super. Ct. May 26, 1999).

39. Judgments on the pleadings are, in general, disfavored in law, but they are "appropriate when all the material allegations of fact are admitted in the pleadings and only questions of law remain." *Shehan v. Gaston Cty.*, 190 N.C. App. 803, 806, 661 S.E.2d 300, 303 (2008) (quoting *Carpenter v. Carpenter*, 189 N.C. App. 755, 757, 659 S.E.2d 762, 765 (2008)).

## V.     ANALYSIS

### A.     **The Dealer Act Does Not Apply and Does Not Vary the Express Terms of the Settlement Agreement.**

40. The administrative protest proceedings which the Settlement Agreement resolves were brought in Kansas pursuant to Kansas dealership statutes, the provisions of which are cited in the Settlement Agreement. Roberts contends, however, that the Dealer Act is applicable because the parties agreed that North Carolina law would govern the validity and construction of the Settlement

Agreement, though it does not call out any provisions of the Dealer Act. (Defs.' Br. Opp. Pls.' Mots. J. Pleadings 6–7 ("Defs.' Br. Opp."), ECF No. 86.)

41. While Volvo and Mack are headquartered in North Carolina and the parties agreed that the Settlement Agreement would be governed by North Carolina law (though they were not limited to that choice, *see* N.C.G.S. § 1G-3), it does not follow that the Agreement was based on or incorporated substantive provisions of the Dealer Act, particularly where, as here, applying the Act would extend its territorial reach beyond its purpose or express terms.

42. It is obvious why Roberts seeks to apply the Dealer Act, for it is widely recognized as containing protections for North Carolina dealers that are among the most aggressive of the several states, and the Dealer Act, if applicable, might preclude termination notwithstanding Roberts' clear agreement otherwise. Roberts seeks to draw from a number of provisions in the Dealer Act that are inconsistent with terms in the Settlement Agreement and relies on one in particular, which provides any agreement inconsistent with its provisions is "null and void and without force and effect." N.C.G.S. § 20-308.2(b)–(c) (prohibiting efforts to avoid the Dealer Act through a choice of law provision). The prohibition against an effort to escape the Dealer Act's provisions through a choice of law term is applicable only "with respect to a new motor vehicle sale within [North Carolina]." *Id.* at § 20-308.2(a). Defendants now invite the Court to apply the Dealer Act to dealership operations wholly outside of North Carolina.

43. Roberts additionally argues in the alternative that the Dealer Act reflects the public policy that should guide the Court even if the Act is not directly applicable. In particular, Roberts highlights that the Dealer Act renders it unlawful for a manufacturer to require a dealer to enter an agreement under threat of termination, to cancel a dealer's franchise when doing so would be inequitable, to terminate in advance of a determination by the North Carolina Commissioner of Motor Vehicles that the termination is for good cause and is made in good faith, or to require a dealer to consent to a prospective release or waiver of rights under the Act. *Id.* at § 20-305(2), (3), (6). Roberts particularly urges adoption of the Dealer Act's lesser standard of "substantial progress" in place of the Settlement Agreement's "strict compliance" requirement for meeting sales quotas. *Id.* at § 20-305(6)(a)(2)(iii).

44. The Court begins its analysis of Defendants' invocation of the Dealer Act by recognizing the presumption against extraterritorial application of North Carolina statutes, *see Sawyer v. Mkt. Am., Inc.*, 190 N.C. App. 791, 796, 661 S.E.2d 750, 754 (2008), and the constitutional issues that would be at play if the Court were to find that the North Carolina legislature sought to exercise its police powers to govern the sale of vehicles by dealers not operating in North Carolina, *see DirecTV, Inc. v. State*, 178 N.C. App. 659, 661–62, 632 S.E.2d 543, 546 (2006) (citing *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 278 n.7 (1977)) ("[A] State is . . . precluded from taking any action which may fairly be deemed to have the effect of impeding the free flow of trade between States."). The Court need not consider any constitutional prohibition on applying the Dealer Act because it concludes that the North Carolina

legislature did not intend to regulate dealer agreements solely governing the sale of motor vehicles outside the State of North Carolina by a dealer, like Roberts here, that does no business in North Carolina, is not and cannot be licensed in North Carolina, and has made no dealership investment in North Carolina.

45. Certain provisions of the Dealer Act are broadly worded with no geographic restriction. For example, the Dealer Act states a "manufacturer" may be either a resident or non-resident, which is logical when regulating an out-of-state manufacturer's sales into North Carolina. N.C.G.S. § 20-286(8e). But there are operative provisions that make clear that the legislature intended that its exercise of police power was limited to the sales in, or to dealers located and licensed in, North Carolina.

46. The Dealer Act recites its public policy as follows:

The General Assembly finds and declares that the distribution of motor vehicles *in the State of North Carolina* vitally affects the general economy *of the State* and the public interest and public welfare, and in the exercise of its police power, it is necessary to regulate and license motor vehicle manufacturers, distributors, dealers, salesmen, and their representatives *doing business in North Carolina*, in order to prevent frauds, impositions and other abuses upon its citizens and to protect and preserve the investments and properties of *citizens of this State*.

*Id.* at § 20-285 (emphasis added).

47. The policy statement makes no mention of non-resident dealership operations outside of North Carolina by dealers that are not doing business in or are not invested in North Carolina.

48. There are other provisions which indicate the Dealer Act's limited reach. For example, while a "motor vehicle dealer" is defined without any specific geographic

reference, a "dealer" cannot operate in North Carolina except as licensed as required by section 287(a) of the Dealer Act, and any applicant for a dealer license must have an established salesroom in North Carolina. *Id.* at § 20-288(d).

49. The Court therefore concludes that the Dealer Act should not be applied to vary the negotiated terms of the Settlement Agreement. The effect of the Settlement Agreement's choice of law provision is to provide that North Carolina's rules of contract construction apply, but it does not mandate incorporating the substantive provisions of the Dealer Act to protect Defendants who are not, and are not qualified to be, North Carolina dealers conducting dealership operations in this State.

50. Accordingly, the Court examines Roberts' affirmative defenses and counterclaims to the extent they may be grounded in North Carolina common law separate from the Dealer Act. Those which depend entirely upon applying the Dealer Act should be dismissed.

**B.** **The Pleadings Conclusively Demonstrate that Roberts Has Not Met the Sales Goals Established by the Settlement Agreement, Thus Plaintiffs are Entitled to Terminate Unless Roberts Is Excused from Performance.**

51. The Settlement Agreement's definitions of the agreed sales targets and what constitutes a sale that can be attributed toward meeting those goals are clear and unambiguous. Where, as here, "the terms to be interpreted 'are plain and unambiguous, there is no room for construction [and] [t]he contract is to be interpreted as written.'" *Pro-Tech Energy Sols., LLC v. Cooper*, 2015 NCBC LEXIS 76, at *16 (N.C. Super. Ct. July 30, 2015) (quoting *Jones v. Casstevens*, 222 N.C. 411,

413, 23 S.E.2d 303, 305 (1942)); *see e.g., Walton v. City of Raleigh*, 342 N.C. 879, 881, 467 S.E.2d 410, 411 (1996) ("If the plain language of a contract is clear, the intention of the parties is inferred from the words of the contract." (citation omitted)). Plain and unambiguous terms should therefore be "given their ordinary, accepted meaning unless it is apparent another meaning is intended[.]" *Peirson v. Am. Hardware Mut. Ins. Co.*, 249 N.C. 580, 583, 107 S.E.2d 137, 139 (1959); *see also Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co*, 351 N.C. 293, 302, 524 S.E.2d 558, 564 (2000) ("[N]ontechnical words are to be given their ordinary meaning."). "If the parties agreed to define a term, and the [contract] contains a definition of a term used in it, this is the meaning which must be given to that term wherever it appears in the [contract], unless the context clearly requires otherwise." *State v. Philip Morris USA Inc.*, 363 N.C. 623, 632, 685 S.E.2d 85, 91 (2009) (internal quotation marks omitted).

52.     These settled principles of contract interpretation govern the Court's review of the Settlement Agreement, including its initial determination of what sales quotas define the standard against which Roberts' performance is measured.

53.     The parties do not dispute the 2016 sales quotas for either Volvo or Mack. The parties also agree that Roberts achieved 85% of the 2016 sales quotas for both Volvo and Mack necessary to avoid termination.

54.     Mack and Roberts agree on the 2017 Mack sales quota. More specifically, they agree that after adjustment for national market sales, the 2016 target for Mack was 19 truck sales and that Roberts sold 18 Mack trucks in 2016.

(Compl. ¶¶ 36–38; Countercl. ¶ 19, ECF No. 41.)  The 2017 sales target for Mack truck sales thus increased from 37 to 38.  (Compl. ¶ 39; Countercl. ¶ 20.)

55.     Mack and Roberts disagree whether Roberts met the 2017 Mack sales quota.  Mack contends that Roberts achieved only 33 sales.  (Br. Supp. Pl. Mack's Mot. J. Pleadings 8, ECF No. 82.)  Roberts contends that it should be credited for an additional 9 trucks sold by another dealer through the Mack Body Builder program, yielding a total of 42 truck sales, thereby meeting its contractual obligation. (Countercl. ¶¶ 20–22.)[1]  The disagreement turns on the definition of a qualifying "sale" as provided in the Settlement Agreement.  Without the benefit of the 9 Body Builder sales, Roberts has admitted that in 2017 it sold only 33 Mack units against the agreed quota of 38 sales.

56.     Roberts does not allege that it would have made additional Mack sales but for Mack's failure to perform under the Settlement Agreement.

57.     Turning then to Roberts' Volvo sales, Volvo and Roberts disagree first as to what sales Roberts achieved in 2016, and second as to how the 2017 sales quota should have been adjusted based on 2016 sales.  Roberts contends and Volvo denies that Roberts exceeded its 2016 quota.  They further disagree as to whether any excess sales affected the 2017 quota.  The Settlement Agreement provides for a carryover of

---

[1] Roberts further references 4 additional sales to Texas Lobo Trucking, which Mack indicated would not apply against the quota because they were outside of Roberts' AOR.  Roberts apparently does not challenge Mack's position because its counterclaim alleges that Roberts achieved 42 sales, which is the total of 33 of Roberts' direct sales plus the 9 Body Builder sales, without accounting for any sales to Texas Lobo Trucking.  (Countercl. ¶ 21.)

sales below the 2016 target but is silent as to whether an excess of 2016 sales would affect the 2017 quota.

58. Volvo and Roberts agree that the 2016 Volvo sales quota was reduced from 35 to 27 trucks based on the adjustment required by the national sales numbers. (Compl. ¶¶ 36–37; Countercl. ¶ 23; Br. Supp. Pl. Volvo's Mot. J. Pleadings ¶ 9, ECF No. 84.) They disagree on how many Volvo sales should be credited to Roberts for 2016.

59. Volvo alleged in its Complaint and Roberts admitted in its Answer that Roberts sold 24 Volvo units in 2016 toward its quota of 27 units, so that a shortage of 3 sales should increase the 2017 quota from 48 to 51 sales. (Compl. ¶ 38; Answer ¶ 18.) However, in its Counterclaim, Roberts refers to a May 16, 2018 e-mail from Volvo, which it contends reflects Volvo's agreement in 2018 to retroactively credit 5 additional sales made to Schock Leasing that had originally been disallowed, with the effect that Roberts was credited with a total of 29 Volvo truck sales in 2016, or an excess of 2 over the agreed 2016 quota of 27. (Countercl. ¶ 24.) Roberts additionally contends that the excess of 2 reduced the 2017 sales quota from 48 to 46. (Countercl. ¶ 24.) Volvo responds that the e-mail on which Roberts relies actually affirms that these 5 additional sales did not qualify as sales under the Settlement Agreement, and that, in any event, the Settlement Agreement does not allow for reducing the 2017 sales quota by excess 2016 sales. (Tr. Sept. 5, 2019 Hr'g 104:14–104:23, ECF No. 89.)

60. These contrasting positions yield varying 2017 Volvo sales quotas of 46, 48, or 51 trucks, depending on what counts as a "sale" under the Settlement Agreement.

61. Volvo's Motion is, in significant part, premised on Roberts' admission that it would have at most sold 49 Volvo trucks in 2017 even if Roberts is credited for sales it did not actually make but contends it could have made or for which it should be credited. Volvo contends that if the 2017 sales quota is 51 trucks, which Volvo argues is the correct quota, Volvo has a right to terminate based on Roberts' own judicial admission.

62. Roberts alleges it should be credited with 49 qualifying sales against its quota of 46 comprised of 21 direct sales, 5 "slots" which Roberts ceded to Volvo for sales by another dealer, 2 sales which were improperly credited to another dealer, and a total of 21 orders for two customers which should have been but were not filled because Volvo failed to meet its contractual obligations. (Countercl. ¶¶ 23–27.)

63. Volvo initially contended that only the 21 actual sales should be credited under the Settlement Agreement. (Pls.' Mot. Dismiss & Answer Defs.' Countercl. ¶ 23.) It later agreed to grant Roberts credit for the 5 "slots," which had resulted in actual sales by another dealer, for a total of 26 sales in 2016. Volvo contends that under the plain meaning of the Settlement Agreement, Roberts receives no credit for any unfilled orders which did not lead to qualifying sales.

64. In sum, both as to Mack and Volvo, Roberts seeks credit for sales that Roberts did not actually make, including some sales made by other dealers but for

which Roberts claims involvement. The Settlement Agreement expressly and unambiguously defines a sale as follows:

> Only those trucks that are sold by Roberts, delivered to the customer, and warranty registered by the last date of each year qualify as a "sale" for purposes of determining whether Roberts achieves the agreed sales numbers set forth above. Further, only those sales made within Roberts' area of responsibility as set forth in Addendum 3 to each of the Dealer Agreements ("AOR") or to any customer outside Roberts' AOR that has not registered Volvo or Mack trucks within the previous three years qualify as a "sale" for purposes of determining whether Roberts achieves the agreed sales numbers set forth above. Provided, however, that once Roberts makes a sale to a customer outside of its AOR that has not registered Volvo or Mack trucks within the previous three years, additional sales to such customer qualify as a "sale" for purposes of determining whether Roberts achieves the agreed sales numbers set forth above.

(Settlement Agreement ¶ 3.)

65. As to Mack, the additional 9 Body Builder credits Roberts seeks are not "sales" under the clear contractual definition, as they relate to trucks that were not sold by Roberts. Without credit for these sales, Roberts admits it failed to meet its 2017 Mack sales quota.

66. As to Volvo, it is equally clear that the 2017 unfilled orders for which Roberts seeks credit were not, in fact, "sales" as defined by the Settlement Agreement to be credited to the 2017 sales quota. Likewise, absent Volvo's subsequent agreement otherwise, it does not appear that the 5 leases mentioned in the May 2018 e-mail on which Roberts relies qualify as sales to be credited to the 2016 quota.

67. However, at least as to the unfilled 2017 orders, Roberts avers that Volvo affirmatively took discriminatory actions which prevented Roberts' ability to perform under the Settlement Agreement.

68.     Of note, if Roberts does not receive credit for the 5 disputed 2016 leases, the 2017 Volvo sales quota would necessarily be adjusted to 51 trucks, and Roberts does not aver he could have met that quota even if Volvo had not prevented his performance.  However, if Roberts is first given credit for these 2016 leases, there would have been no shortfall in 2016 sales requiring an upward adjustment of the 48-truck sales quota provided for in the Settlement Agreement.  In that event, the 2017 quota would be either 46 or 48, depending on whether the Settlement Agreement can be read to allow a downward adjustment even though any such adjustment was not expressly provided for.

69.     If the sales quota remains at 48 after crediting Roberts for the disputed 2016 leases, Roberts would be required to demonstrate that it is entitled to credit for 2 sales Volvo credited to another dealer.  Roberts otherwise alleges only that it would have achieved 47 sales in 2017 without the benefit of those 2 sales.

70.     In short, based on Roberts' own allegations, the Court would be required to delve into issues related to Volvo's alleged breach of its own performance obligations only if Roberts is entitled to credit both for the contested five 2016 leases and the two 2017 sales credited to another dealer.

## C.     Roberts Failed to Meet its Performance Obligations Necessary to Prevent Termination of its Mack Dealership.

71.     As explained above, Roberts has not alleged that it made or could have made 2017 Mack sales that satisfy the uncontested 2017 Mack sales quota of 38.  As a matter of law, the Body Builder sales by another Mack dealer do not qualify as sales to meet the 2017 quota.

72.     Roberts has made no claim that Mack failed to timely provide Roberts with inventory necessary to achieve the required sales as it has against Volvo.

73.     The Court concludes that there is no factual dispute that Roberts failed to meet its 2017 Mack truck sales quota required by the Settlement Agreement. Without credit for Body Builder sales by other dealers, there is no construction of the Settlement Agreement that allows for any conclusion other than that Roberts failed in its performance and is bound by its agreement to terminate its Mack dealership unless Roberts has an affirmative non-contractual counterclaim that would preclude termination.

74.     As discussed below, Roberts has alleged no such actionable counterclaim against Mack.

75.     Each of Mack's motions should therefore be granted.

**D.      The Court Cannot Resolve the Contested Issue of What 2017 Volvo Sales Quota Governs Roberts' Performance Obligation on the Pleadings.**

76.     As to Volvo, the issues are as follows:

a.      Roberts has alleged that it would have achieved a maximum of 49 Volvo trucks in 2017.

b.      Before any adjustment based on 2016 sales, the 2017 Volvo sales quota provided by the Settlement Agreement is 48.

c.      If Roberts is not entitled to credit for the disputed 5 leases in 2016, it sold 3 trucks less than its 2016 sales quota so that the 2017 sales quota became 51.

d. Without the benefit of the five 2016 leases, Roberts has admitted it failed to perform under the Settlement Agreement, whether or not it could prove that Volvo otherwise breached its performance obligations.

e. With the benefit of the disputed 2016 leases, the 2017 quota either remained at 48 or was reduced to 46. The Court reserves determination of whether the Settlement Agreement can be construed so as to reduce the 2017 sales quota based on 2016 sales in excess of the 2016 quota.

f. If Roberts can prove that it is entitled to 2 sales which Volvo credited to another dealer, it alleges that it could have sold 49 Volvo units. If it is not entitled to credit for those 2 sales, Roberts alleges that it could have sold 47 Volvo trucks, meeting a 2017 sales quota of 46 but not meeting a 2017 sales quota of 48.

77. The Court concludes that there are fact disputes that must be resolved before establishing the 2017 Volvo sales quota against which Roberts' performance must be measured. Thus, the Court is denying Volvo's Motion for Judgment on the Pleadings and expediting consideration of the Severed Issue under the Court's authority to manage the case under Rule 42. It also concludes for judicial efficiency that the 2017 Volvo sales quota should be determined before proceedings on Volvo's own performance become subject to discovery, further motion practice, or trial. Unlike the factual and legal issues necessary to resolve whether Volvo met its

contractual obligations, determining the appropriate 2017 sales quota does not require extensive discovery or an extensive evidentiary presentation.

78. The Court concludes, in its discretion, that it is then appropriate to sever for early determination the contested issue of what 2017 Volvo sales quota Roberts was required to meet.

**E. First Assuming that the 2017 Volvo Sales Quota Is Defined in its Favor, Roberts Has Adequately Pleaded a Claim of a Breach of the Implied Covenant of Good Faith as to Volvo But Not as to Mack.**

79. If the Court must ultimately consider the merits of Roberts' allegation that Volvo breached its performance obligations, Roberts has the burden of proving that Volvo acted or failed to act in a manner which prevented Roberts from performing under the contract. The elements of a breach of contract claim are: "(1) existence of a valid contract and (2) breach of the terms of that contract." *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000) (citing *Jackson v. California Hardwood Co.*, 120 N.C. App. 870, 871, 463 S.E.2d 571, 572 (1995)).

80. Roberts cannot rely on the Dealer Act to satisfy its burden of proof.

81. Volvo contends that Roberts seeks to enforce obligations that are either not provided for or are inconsistent with the Settlement Agreement. Roberts in turn invokes the implied covenant of good faith.

82. North Carolina implies in every contract a covenant that requires the parties to exercise good faith and fair dealing in the execution and performance of the contract. *Bicycle Transit Authority, Inc. v. Bell*, 314 N.C. 219, 229, 333 S.E.2d 299, 305 (1985) ("In every contract there is an implied covenant of good faith and fair

dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." (citation omitted)); *Weyerhaeuser Co. v. Building Supply Co.*, 40 N.C. App. 743, 746, 253 S.E.2d 625, 627 (1979) ("It is a basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement.").

83. This implied covenant of good faith is not to be applied to vary express terms of a contract to which the parties agreed, and where contractual language is not ambiguous, the express language of the contract controls. *Pro-Tech Energy Sols., LLC*, 2015 NCBC LEXIS 76, at *21 (citing cases); *Heron Bay Acquisition, LLC v. United Metal Finishing, Inc.*, 2014 NCBC LEXIS 16, at *42 (N.C. Super. Ct. May 7, 2014) (citation omitted).

84. Nevertheless, "[a] party to an executory contract is under a duty not to do anything to prevent the other party to the contract from performing" its contractual obligations. *Suntrust Bank v. Bryant/Sutphin Prop., LLC*, 222 N.C. App. 821, 831, 732 S.E.2d 594, 601 (2012) (quoting *Pedwell v. First Union Nat'l Bank,* 51 N.C. App. 236, 238, 275 S.E.2d 565, 567 (1981)); *see also Emily's Cookie Mix, Inc. v. CORA L.P.*, 2005 N.C. App. LEXIS 2434, at *7–8 (Nov. 15, 2005).

85. Roberts alleges that Volvo inhibited its ability to perform under the Settlement Agreement as follows:

> Volvo had a duty to build and deliver the orders on time to comply with the Agreement; and such a requirement is an implied covenant or condition for defendants' performance, *i.e.* that defendants' orders would be built and delivered. By failing or refusing to build or deliver the units,

Volvo is estopped to withhold or deny counting the units towards the sales requirements for defendants and has breached the Agreement in so doing such that the units must be counted toward the sales requirements. As a result of Volvo's action or inaction defendants [sic] orders that otherwise would have been delivered during the relevant period and counted toward the sales requirements for the Agreement were cancelled and lost.

(Countercl. ¶ 25.)

86. Broadly read, Roberts' counterclaim against Volvo does not depend entirely on incorporating provisions of North Carolina's Dealer Act that impose specific duties on manufacturers, including available inventory. Although tending toward the conclusory, Roberts alleges that Volvo purposefully discriminated against Roberts in the course of its normal operations. After careful deliberation, the Court concludes that the breach of contract counterclaim as to Volvo is marginally adequate to withstand Rule 12(b)(6). *See Governor's Club Inc. v. Governor's Club L.P.*, 152 N.C. App. 240, 252, 567 S.E.2d 781, 789 (2002).

87. Roberts has made no similar allegations regarding Mack, and the Court therefore dismisses Roberts' claim of breach of implied warranty of good faith and fair dealing to the extent it is asserted against Mack.

### F. **Roberts Has No Basis to Proceed Based on the Doctrine of Unconscionability, Either as a Defense or as an Affirmative Claim.**

88. Roberts contends, relying on the Dealer Act, that the Court should inquire into the reasonableness of the agreed sales targets set out in the Settlement Agreement before requiring specific performance. While Roberts contends that its assertion that the terms of the Settlement Agreement are unconscionable does not

depend on applying the Dealer Act, the Court finds no basis for applying the unconscionability doctrine to the facts of this case.

89.     While the law remains somewhat unsettled, a North Carolina court will not enforce a contract it finds to be unconscionable. *Rite Color Chemical Co. v. Velvet Textile Co.*, 105 N.C. App. 14, 18, 411 S.E.2d 645, 647 (1992) (citing cases). The potential application of the unconscionability doctrine outside claims based on the sale of goods has received passing recognition, but with little actual application. *See e.g., Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 213, 274 S.E.2d 206, 210–11 (1981) (holding a contract for non-refundable tuition payments was not unconscionable); *Alpiser v. Eagle Pontiac-GMC-Isuzu, Inc.*, 97 N.C. App. 610, 615, 389 S.E.2d 293, 296 (1990) (holding an automobile lease was not unconscionable). *But see Howell v. Landry*, 96 N.C. App. 516, 525, 386 S.E.2d 610, 615 (1989), *disc. rev. denied*, 326 N.C. 482, 392 S.E.2d 90 (1990) (explaining courts will not enforce unconscionable premarital or post-marital agreements).

90.     "[I]ssues of unconscionability . . . are questions of law to be resolved by our trial courts." *Rite Color Chemical Co.*, 105 N.C. App. at 21, 411 S.E.2d at 649 (citations omitted).

91.     The elements of an unconscionability claim are restrictive and require both procedural and substantive unfairness. North Carolina precedent dictates that

> [a] court will generally refuse to enforce a contract on the ground of unconscionability only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other. In determining whether a contract is unconscionable, a court

must consider all the facts and circumstances of a particular case. If the provisions are then viewed as so one-sided that the contracting party is denied any opportunity for a meaningful choice, the contract should be found unconscionable.

*Brenner*, 302 N.C. at 213, 274 S.E.2d at 210 (internal citations omitted) (finding no unconscionability because there was no "inequality of bargaining power between the parties" and the plaintiff "was not forced to accept [the] defendant's terms").

> Although there is some confusion . . . as to whether a court may determine a contract to be unconscionable on the basis of only one of [procedural or substantive unconscionability] this Court has previously held that "[t]o find unconscionability there must be an absence of meaningful choice on part of one of the parties [procedural unconscionability] *together with* contract terms which are unreasonably favorable to the other [substantive unconscionability]."

*Rite Color Chem. Co.*, 105 N.C. App. at 20, 411 S.E.2d at 649 (emphasis in original) (quoting *Martin v. Sheffer*, 102 N.C. App. 802, 805, 403 S.E.2d 555, 557 (1991)).

92. The Court concludes that Roberts has not made allegations that, even if accepted as true, are adequate to allow the unconscionability doctrine to be applied on the pleaded facts. The parties were represented by counsel, entered an agreement in the midst of administrative proceedings, and were well advised as to the substantive law governing their relationship. *See Wilner v. Cedars of Chapel Hill, LLC*, 241 N.C. App. 389, 393, 773 S.E.2d 333, 336 (2015) (holding no unconscionability where plaintiff had counsel present at a real estate closing and the contracts had detailed notes in the margins explaining what each provision entailed).

93. Accordingly, the Court concludes, as a matter of law, that Roberts' assertion of unconscionability fails whether presented as a claim or as a defense.

**G.    Roberts Has Not Asserted an Actionable Claim for an Unfair or Deceptive Trade Practices**

94.    Through its Seventh Counterclaim, Roberts contends that Volvo and Mack committed an unfair or deceptive trade practice through their actions or inactions under the Settlement Agreement.  The Court concludes that this claim fails as a matter of law.

95.    First, it appears that Roberts relies on the Dealer Act's definition of an unfair practice in section 20-305(14) of the North Carolina General Statutes to fashion its claim.  Again, the Court has concluded that the Dealer Act does not apply.

96.    Second, to the extent that Roberts seeks to fashion an unfair or deceptive trade practice claim under section 75-1.1 of the North Carolina General Statutes from the nature and degree of Plaintiffs' alleged breach of the Settlement Agreement, the Court concludes that Roberts has not alleged substantial aggravating circumstances sufficient to raise its contract claim to the level of an actionable unfair or deceptive trade practice.  *See Kerry Bodenhamer Farms, LLC v. Nature's Pearl Corp.*, 2017 NCBC LEXIS 27, at *19 (N.C. Super. Ct. Mar. 27, 2017) ("[A] plaintiff alleging breach of contract must show substantial aggravating circumstances attending the breach to recover[.]" (internal quotations omitted)).

97.    Accordingly, Roberts' counterclaim for violation of the North Carolina Unfair Trade Practices Act should be dismissed.

## VI.    CONCLUSION

98.    For the foregoing reasons:

a.    Mack's Motion for Judgment on the Pleadings is GRANTED;

b. The Court hereby DECREES, DECLARES, and ADJUDGES that Mack is entitled specifically to enforce Roberts' obligation to terminate its Mack Dealer Agreement and cease any further Mack dealership operations pursuant to the Dealer Agreement;

c. Mack's Motion to Dismiss Roberts' Counterclaims is GRANTED and those counterclaims are dismissed with prejudice;

d. Volvo's Motion to Dismiss Roberts' Counterclaims for unconscionability and violation of the North Carolina Unfair Trade Practices Act is GRANTED and those claims are dismissed with prejudice;

e. Volvo's Motion for Judgment on the Pleadings and Motion to Dismiss are otherwise DENIED without prejudice to the presentation of a subsequent motion for summary judgment;

f. The Court, in its discretion, determines that the issue of defining the 2017 Volvo sales quota should be severed for early determination, with any proceedings as to any other issue being deferred, so that accordingly, the Court directs that:

   i. The parties may have a period of discovery, not to exceed 60 days to commence no earlier than the expiration of current orders of Chief Justice of the North Carolina Supreme Court suspending activities in pending litigation;

ii. Any such discovery is restricted to defining the applicable 2017 Volvo sales quota against which Roberts' performance is to be measured;

iii. The parties may, by mutual agreement, initiate the discovery period on the Severed Issue at an earlier date;

iv. The Court anticipates that it will not grant any extension of time within which to respond to written discovery once the discovery period has commenced;

v. Absent leave of court, Volvo and Roberts may each take a maximum of 3 depositions on the Severed Issue, each to be taken subject to the provisions of BCR 10.7;

vi. Either party shall file any dispositive motion on the Severed Issue no later than 20 days following the close of the discovery period allowed on the Severed Issue. The response to any such motion shall be filed within 20 days rather than the 30-day period otherwise provided by BCR 7.6. No reply brief shall be filed absent leave of court;

vii. All further proceedings are stayed pending further order of the Court.

SO ORDERED, this the 8th day of April, 2020.

/s/ James L. Gale

James L. Gale
Senior Business Court Judge